Melinda ASUNCION, Plaintiff,

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

No. 06 Civ. 13144(SAS)(DF).

United States District Court,
S.D. New York.

June 25, 2007.

Jason Newfield, Justin Frankel, Frankel & Newfield, P.C., Garden City, NY, for plaintiff.

Alan Marcus, Lester Schwab Katz & Dwyer, New York, NY, for defendant.

## MEMORANDUM AND ORDER

FREEMAN, United States Magistrate Judge.

This ERISA case has been referred to me for general pretrial supervision. On June 18, 2007, the Court held a telephone conference with counsel, during which the Court made certain oral rulings with respect to a discovery dispute that had been pending before the Court. The dispute primarily involved the questions of whether defendant Metropolitan Life Insurance Company ("Met Life") should be required to produce (a) certain communications (claimed by Met Life to be subject to attorney-client privilege) between the case manager at Met Life who handled plaintiff Melinda Asuncion's ("Plaintiff") claim for benefits and an in-house attorney at Met Life, and (b) the contracts (withheld by Met Life on relevance grounds) between Met Life and the outside consultants who were involved with evaluating Plaintiff's benefits claim. After reviewing the documents *in camera*, the Court ruled that all of the documents in question, except for a contract between Met Life and Dr. Tracey Schmidt, should be produced. This Memorandum and Order is intended to memorialize the Court's June 18 rulings.[1]

## DISCUSSION

### I. THE DOCUMENTS CLAIMED AS PRIVILEGED

#### A. *Factual and Procedural Background*

This case has an unusual history, in that this is the second time that Plaintiff has commenced a lawsuit challenging Met Life's discontinuation of her long-term disability ("LTD") benefits. Plaintiff commenced her first suit in 2004, seeking benefits for a period commencing June 2003. That suit was settled in 2005, and, as part of the settlement, Plaintiff was reinstated to benefits as of April 1, 2005. In June 2005, however, Met Life again terminated

---

1. Although the Court's oral rulings were made on the record at the June 18 conference, and the conference was audio-taped, the Court informed the parties that it would stay their time to appeal its ruling to 10 days following the issuance of this written opinion.

Plaintiff's benefits, stating that, as her disabling condition was a "mental or nervous condition," she was not entitled, under the terms of her group plan, to benefits for more than a limited period of time. That termination decision was apparently made by Sherri Ryan ("Ryan"), a senior case manager at Met Life. Although another senior case manager at Met Life, Sandi Day ("Day"), then undertook a separate investigation to determine whether Plaintiff also had a *physical* condition that warranted continued payment of LTD benefits, Day ultimately determined that Plaintiff was not entitled to further benefits for that purported condition either, and sent Plaintiff's counsel a letter on or about April 7, 2006, denying such benefits.

For the most part, the attorney-client communications at issue were written between the date in June 2005 when Met Life (through Ryan), informed Plaintiff that she was being denied benefits based on her "mental or nervous condition," and the date in April 2006 when Met Life (through Day) informed Plaintiff that she was also being denied benefits based on her physical condition. Only one of the documents at issue seems to have pre-dated that interim period—that document consists of an e-mail from Louisa Ruffine, Esq. ("Ruffine"), in-house counsel at Met Life, to Ryan, attaching a revised copy of the June 2005 denial letter. The rest of the purportedly privileged documents involve communications between Day and in-

house counsel, leading up to Day sending Plaintiff's counsel the second denial letter in April 2006.[2]

Specifically, on or about February 13, 2006, Day prepared a draft letter to Plaintiff's counsel and forwarded it to Ruffine for her review. Ruffine apparently edited the letter and provided comments on its drafting, prior to the letter being sent out. During the same period, Day also communicated with Ruffine regarding what was apparently, at least with respect to one issue, still an ongoing investigation into the question of whether Plaintiff's alleged physical condition should be considered disabling.

At the Court's request, Day has submitted an affidavit addressing the question of when Met Life actually made its final decision to deny Plaintiff benefits based on her physical condition. (Affidavit of Sandi Day, sworn to June 1, 2007 ("Day Aff.").[3]) Day attests that, although she had initially drafted a denial letter to Plaintiff's counsel on or about February 14, 2006,[4] she "then decided to delay sending out the denial letter until [she] could further investigate certain matters." (*Id.* ¶¶ 5, 7.) Day then states that, after her "further investigation was complete, [her] decision to deny the claim remained unchanged." (*Id.* ¶ 8.) On the subject of her communications with counsel, Day explains that, "[b]ecause [she] was aware that this claim had been the subject of a prior litigation, and that a

2. In addition, one of the withheld documents—an e-mail message from Laura Sullivan ("Sullivan"), a Met Life "business consultant," to in-house counsel, dated April 11, 2006—appears to have been written after Met Life sent Plaintiff its April 2006 denial letter. There is, however, no substantive content to this e-mail message, which contains nothing other than a request for counsel to call Sullivan. Based on the remarks of Met Life's counsel during the Court's June 18 telephone conference, it is the Court's understanding that Met Life has now conceded that this

particular document is subject to production, and thus the Court will not address it further herein.

3. Met Life has provided a copy of this affidavit to Plaintiff's counsel.

4. From the documents submitted to the Court for *in camera* review, it appears that Day had already drafted her letter by at least February 13, 2006, as e-mail records show that she sent the draft to Ruffine on that date.

denial would likely lead to further litigation," she decided to have her initial draft letter reviewed by counsel. (*Id.* ¶ 6.)

### B. *Applicable Law*

■■■ Where, as is the case here, the court's subject matter jurisdiction is based on a federal question, privilege issues are governed by federal common law. Fed. R.Evid. 501. Under federal common law, " '[t]he fact that a document is sent or received between attorney and client does not make it privileged unless it contains confidential communications relating to legal advice.' " *Bell v. Pfizer*, No. 03 Civ. 9945(KMW)(HBP), 2006 WL 2529762, at *4 (S.D.N.Y. Aug. 31, 2006) (quoting *Grossman v. Schwarz*, 125 F.R.D. 376, 387 (S.D.N.Y.1989)). The attorney-client privilege protects communications between client and counsel where such communications are made for the purpose of seeking or providing legal advice and are intended to be, and are in fact, kept confidential. *See United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir.1996) (citing *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976)). The party asserting the privilege has the burden of establishing its existence. *See Bell*, 2006 WL 2529762, at *4 (citing *United States v. Int'l Broth. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997)).

■■■ "In the ERISA context, however, there is a 'fiduciary exception' to the attorney-client privilege." *Black v. Bowes*, No. 05 Civ. 108(GEL), 2006 WL 3771097, at *1 (S.D.N.Y. Dec.21, 2006). An ERISA fiduciary is obligated to provide a plan beneficiary with all information related to plan administration, including "any communications with an attorney that are intended to assist in the administration of the plan." *In re Long Island Lighting Co.*, 129 F.3d 268, 271–72 (2d Cir.1997) (citation omitted). Accordingly, under the fiduciary ex-

ception, a trustee "acting in the capacity of ERISA fiduciary is disabled from asserting the attorney-client privilege against plan beneficiaries on matters of plan administration." *Id.*

■■■ Not all communications relating to an ERISA plan are subject to the fiduciary exception to the attorney-client privilege. In particular, courts have found that, " '[w]hen an ERISA trustee seeks legal advice for his own protection, the legal fiction of trustee as representative of the beneficiaries is dispelled,' " and therefore the fiduciary exception is not applicable. *See Black*, 2006 WL 3771097, at *2 (quoting *United States v. Mett*, 178 F.3d 1058, 1065 (9th Cir.1999)).

■■■ The defendant's "ability to invoke the attorney-client privilege to resist disclosure sought by plan beneficiaries turns on whether or not the communication concerned a matter as to which the employer owed a fiduciary obligation to the beneficiaries." *In re Long Island Lighting*, 129 F.3d at 271. To determine "whether the purpose of … seeking legal advice is to fulfill an administrator's fiduciary duties or to avoid litigation accusing him of failing to fulfill those duties," courts engage in a "fact-specific inquiry," examining both the content and context of the specific communication. *Black*, 2006 WL 3771097, at *2–*3; *see also Mett*, 178 F.3d at 1064. Frequently, the key question is whether the communication was made before or after the final decision to deny benefits. Courts have "considered it highly relevant that communications occurred after the challenged benefits determination took place," because, by that point, "there should be little need for administrators to consult counsel regarding a specific benefits determination." *Id.* at *3 (citing *Bell*, 2006 WL 2529762, at *7); *see also Coffman v. Metro. Life Ins.*, 204 F.R.D. 296, 299 (S.D.W.Va.2001) (finding that all but

one document was subject to fiduciary exception as these documents were, *inter alia*, "created before the final denial of benefits by MetLife"); *Geissal v. Moore Med. Corp.*, 192 F.R.D. 620, 625–26 (E.D.Mo.2000) (holding that pre-decisional legal opinion and advice were not privileged, whereas post-decisional legal advice was privileged).

### C. *The Documents at Issue Should Be Produced:*

 The threshold question presented is whether the documents at issue are, in fact, covered by the attorney-client privilege. Met Life has the burden of establishing the existence of the privilege, *see Bell*, 2006 WL 2529762, at *4, but, as to the single e-mail from Ruffine to Ryan, apparently attaching a revised version of Ryan's June 2005 denial letter to Plaintiff, the Court notes that Met Life has made no showing that either the e-mail or its attachment meets the criteria for a privileged communication. Even upon *in camera* review, the Court cannot determine whether Ryan had requested legal advice from Ruffine, or if Ruffine had provided any such advice. Indeed, the withheld documents merely demonstrate the transmission of a revised letter; there is nothing in these documents that shows the Court that anything of a "legal" character was ever discussed between attorney and client.

 Moreover, although Day suggests in her affidavit that she sent Ruffine a draft of her April 2006 letter denying benefits because of Day's concern that the matter could end up in litigation, her communications to counsel also do not reflect a request for legal advice. Nor do counsel's communications to her, in response to her request for review of the letter, reflect the rendering of legal advice. In fact, in the one document where Day poses a specific question to Ruffine, that question merely relates to Met Life's factual investigation of Plaintiff's job description. Nothing about the exchange between Day and Ruffine on this subject suggests that Ruffine was being asked to give legal advice; rather, the communications appear to relate solely to that factual investigation, which was apparently conducted so as to determine Plaintiff's eligibility for benefits.

 Further, even if Ruffine's communications with Day regarding Day's draft letter were subject to protection as privileged, under the circumstances, the fiduciary exception to the privilege would apply in this case. Met Life contends that the fiduciary exception does not apply to the attorney-client communications at issue because they were made after the challenged benefits determination took place. (*See* Met Life's Letter Brief in Opposition to Plaintiff's Motion to Compel, dated Apr. 9, 2007 ("Met Life Opp."), ¶ B(4).) On this issue, Met Life apparently asserts that Day *actually* made the decision to deny Plaintiff's claim in *February* 2006, and that any subsequent communications with counsel were merely requests for legal advice as to the wording of her proposed denial letter. *See id.*

On the contrary, fairly read, both Day's affidavit and the submitted documents strongly suggest that Day's draft letter did *not* represent a final decision regarding Plaintiff's entitlement to benefits. Indeed, it is clear, as alluded to above, that at least one aspect of Day's investigation (*i.e.*, regarding Plaintiff's job description) continued during the period after she prepared that draft letter, and, although Day states that she did not change her initial decision after her investigation of the facts was complete, the implication is that, had the investigation yielded different information, she might well have done so. Certainly, Met Life would be hard pressed to argue that it had made its final decision as to

Plaintiff's eligibility for disability benefits prior to obtaining correct and complete information regarding Plaintiff's job description.

Moreover, the nature of counsel's comments on Day's draft letter do not reflect advice as to the legal implications of any actions by Day, or as to the potential liability of Met Life, as the plan administrator, in imminent or pending litigation. Rather, the comments by counsel are more in the nature of general edits to the letter, directed to issues of accuracy and completeness, or to matters of phrasing and format.

 Finally, although it is true, as Met Life points out (*see* Met Life Opp. ¶ B(4)), that Plaintiff had previously sued for benefits, suggesting an increased likelihood that she would sue again if her benefits were not restored, the mere fact that "an adversarial relationship existed as a general matter" as the result of the prior suit does not mean that Met Life was no longer required to act as a fiduciary with respect to any subsequently-presented benefits claim. *Black,* 2006 WL 3771097, at *4. The "mere prospect of litigation" is not enough to "render communications between fiduciaries and counsel privileged, because the prospect of litigation is always present in decisions about whether to grant or deny benefits." *Id.* at *3; *see also Anderson v. Sotheby's Inc. Severance Plan,* No. 04 Civ. 8180(SAS)(DFE), 2005 U.S. Dist. LEXIS 9033, at *30 (S.D.N.Y. May 13, 2005) (noting that "[e]ven if a defendant were to claim that he created the withheld documents in anticipation of litigation, the fiduciary exception may still apply").

## II. *THE CONSULTANT CONTRACTS*

Plaintiff has argued that Met Life should be required to produce documentation relating to Met Life's relationships with independent medical personnel. (*See* Plaintiff's Letter Motion to Compel, dated Apr. 30, 2007, ¶ 4.) In opposition to Plaintiff's request, Met Life has principally maintained that these documents are not discoverable as they exceed the scope of discovery permitted in an ERISA action. (Met Life Opp. ¶ A.)

As a preliminary matter, the Court notes that it has previously held in this case that Plaintiff was entitled to some limited discovery of facts not contained in the administrative record. Specifically, the Court found that contracts between Met Life and the independent consultants who were involved with the denial of Plaintiff's benefits claim could be relevant to demonstrate that the consultants had a conflict of interest in evaluating Plaintiff's claim. In similar circumstances, courts in this circuit have permitted discovery in an ERISA action where evidence is sought to establish a conflict of interest. *See generally Porter v. Prudential Ins. Co. of Am.,* No. 05 Civ. 6113(KMK)(RLE), 2006 WL 2038457, at *2 (S.D.N.Y. July 18, 2006) (noting that "discovery geared toward assessing potential conflicts of interest ... would be proper"); *Mitchell v. First Reliance Standard Life Ins. Co.,* 237 F.R.D. 50, 54 (S.D.N.Y.2006) (permitting plaintiff to conduct discovery on, *inter alia,* matters relating to plan administrator's alleged conflict of interest); *Allison v. Unum Life Ins. Co.,* No. 04 Civ. 0025(JSW)(DW), 2005 WL 1457636, at *13 (E.D.N.Y. Feb. 11, 2005) (finding that, on *de novo* review, plaintiff was entitled to discovery about whether plan administrator and/or medical consultant had conflict when claim was determined, and whether that conflict influenced the determination).

Before ordering Met Life to produce these contracts, however, the Court directed that they be submitted for *in camera* review, so that the Court could determine whether the contracts actually contained

any relevant information. Met Life subsequently provided the Court with a copy of a contract between Met Life and Dr. Tracey Schmidt ("Schmidt") and a contract between Met Life and Dr. Amy Hopkins ("Hopkins").

After reviewing the two contracts, the Court finds no basis for requiring the production of the Schmidt contract. Nothing about that contract suggests that Schmidt served in anything other than an independent capacity.

The Hopkins contract, on the other hand, should be produced. Although the contract shows that Hopkins' pay was not tied to her particular claimant evaluations, there is at least a suggestion in the contract that Hopkins may have been hired to serve as a consultant in the first instance as the result of her espousal of a particular point of view as to whether it is generally in a claimant's best interest to work, rather than to receive disability benefits. Based on the language in the contract itself, the Court is satisfied that the agreement is relevant to Plaintiff's claims in this case. *See Nagele v. Elec. Data Systems Corp.*, 193 F.R.D. 94, 111 (W.D.N.Y.2000) ("Whether a medical advisor to a plan administrator exercises independent judgment or functions as an arm of the administrator is relevant to the issue of arbitrary decision making . . . .").

### CONCLUSION

For all of the foregoing reasons, Met Life is directed to produce all of the documents that it submitted to the Court for *in camera* review, with the exception of the Consulting Agreement between Met Life and Tracey Schmidt.

SO ORDERED.