**UNITED STATES of America, Plaintiff–Appellee,**

v.

**William D. METT, Defendant–Appellant.**

United States of America, Plaintiff–Appellee,

v.

Marvin L. Wiseman, Defendant–Appellant.

Nos. 97–10504, 97–10505.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 1999.

Filed June 1, 1999.

Arthur K. Wachtel, San Francisco, California, for defendant-appellant Wiseman.

Dennis P. Riordan, Donald M. Horgan, Riordan & Rosenthal, San Francisco, California, for defendant-appellant Mett.

Lawrence L. Tong, Assistant United States Attorney, Honolulu, Hawaii, for the plaintiff-appellee.

Before: FLETCHER, and TASHIMA, Circuit Judges, and SINGLETON,[*] District Court Judge.

FLETCHER, Circuit Judge:

William Mett ("Mett") and Marvin Wiseman ("Wiseman") appeal from jury convictions arising out of certain improper transactions involving pension benefit plans administered by them. Because highly prejudicial evidence was erroneously admitted against the defendants at trial in violation of the attorney-client privilege, and because this error was not harmless, we reverse the convictions. In order to assist the district court on remand, we also take this opportunity to clarify certain aspects of the scienter required for a pension fund embezzlement conviction pursuant to 18 U.S.C. § 664.

## FACTS

These criminal prosecutions stem from certain transactions involving ERISA[1] pension benefit plans administered by Center Art Galleries ("CAG") for its employees. Mett founded CAG, a retail art gallery, in 1973 and served as its president and sole shareholder. Wiseman served as a vice-president, responsible for staff training and art acquisition. Both defendants also served on the CAG board of directors. In 1977, CAG established two pension benefit plans for its employees. Both plans were funded solely by CAG contributions, and both were covered by ERISA. At all relevant times, Mett and Wiseman served as trustees for both plans, while CAG served as the plan administrator.

CAG fell on hard times in the early 1990s. In 1990, as a result of a federal investigation into CAG's sales practices,

---

[*] The Honorable James K. Singleton, Jr., Chief Judge for the District of Alaska, sitting by designation.

1. Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*

Mett, Wiseman, and CAG were indicted, tried and convicted of felony art fraud. The prosecution, coupled with a general downturn in the Hawaiian economy, proved devastating to CAG's financial health. Between March 1990 and November 1991, in order to meet CAG's financial obligations, Mett and Wiseman withdrew approximately $1.6 million from the pension plans and deposited the funds into CAG's general operating accounts. At no time during 1990 and 1991 did the defendants inform their employees of these transactions. CAG also did not disclose the withdrawal transactions on the 1990 Form 5500 that it filed with the IRS in connection with one of the benefit plans.[2]

On June 27, 1996, a federal grand jury returned a 16 count indictment against the defendants in connection with the pension plan withdrawals. At trial, the defense turned on whether the defendants possessed the requisite specific intent when they arranged the withdrawals. While admitting that they withdrew funds from the pension plans, the defendants characterized the withdrawals as "loans" necessary to carry CAG through rough financial times. According to the defendants, their actions were intended to benefit their employees, who would otherwise have been laid off and faced with unemployment. The defendants further argued that the employees implicitly authorized, or would have authorized the withdrawals had they known of them. On June 25, 1997, the jury convicted the defendants on 15 counts,[3] finding them guilty of embezzling from a pension benefit plan, in violation of

18 U.S.C. § 664, conspiring to misappropriate the assets of a pension benefit plan, in violation of 18 U.S.C. § 371, unlawfully serving as a trustee of a pension benefit plan after being convicted of a felony, in violation of 29 U.S.C. § 1111, and filing a false annual report relating to a pension benefit plan, in violation of 18 U.S.C. § 1027.[4] The district court entered final judgment on November 7, 1997, and sentenced both defendants to 70 months of imprisonment to be followed by three years of supervised release. This appeal followed.[5]

## DISCUSSION

**I. Admission of Attorney–Client Privileged Documents**

■ Prior to trial, the defendants unsuccessfully sought to suppress on attorney-client privilege grounds three memoranda sent to them by their then-counsel, Mr. Thomas Foley ("Foley"). At trial, the government called Foley to testify, and two of the three memoranda were admitted into evidence. The defendants contend that the memoranda and much of Foley's testimony relating to them should have been excluded in light of the attorney-client privilege, and that admission of these communications constituted an error requiring reversal of their convictions. The government responds by invoking the "fiduciary exception" to the attorney-client privilege.[6] We review the district court's privilege determination *de novo*. See *United States v. Bauer*, 132 F.3d 504, 507

---

2. Pursuant to applicable tax laws, CAG as plan administrator was required to file Form 5500 annually in connection with one of the CAG plans, the Defined Benefit Plan. In completing a Form 5500, a plan administrator generally must report any transactions with parties in interest.

3. One count was dismissed at the close of the government's case.

4. The last count, involving the false filing of an annual report relating to an ERISA plan, named only Mett.

5. The district court had jurisdiction over this criminal matter pursuant to 18 U.S.C. § 3231. Both defendants timely filed their respective notices of appeal. This court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

6. The government does not contest the existence of an attorney-client relationship between Foley and the defendants, nor does it dispute that the communications at issue constituted the sort of legal advice that would generally come within the scope of the attorney-client privilege.

(9th Cir.1997) (reviewing *de novo* as mixed questions of law and fact the district court's rulings relating to the existence and scope of attorney-client privilege).

## A. The privileged communications

Foley and his firm, Foley, Maehara, Judge, Nip & Chang ("Foley, Maehara"), apparently wore many hats, serving at various times as counsel to Mett and Wiseman personally and in their capacities as ERISA plan trustees, to CAG as a corporation and in its role as plan administrator, and to the ERISA plans themselves.[7]

The two memoranda at issue relate to the potential civil and criminal consequences of the 1990 and 1991 pension plan withdrawals. The first of the two memoranda, dated August 19, 1991, was addressed to both Mett and Wiseman and explained the nature of the legal advice that was being provided:

> You have asked our advice regarding the criminal and civil sanctions which may [sic] applicable to the following facts.
>
> *Facts*
>
> In order to sustain the company's operations, you have borrowed approximately $800,000 from the Corporation's Defined Benefit Pension Plan without adequate security and to date without any repayment. While you are prepared to execute a note and collaterally secure the note with corporate assets including debt free inventory of fine art, you have not done so.

The August 19 memorandum goes on to detail the potential civil and criminal exposure the defendants might face in light of the withdrawals, and for their failure to report the transactions on IRS Form 5500. The second memorandum, dated August 26, 1991, is a memorandum to file, prepared by one of Foley's law firm associ-

ates, that further details the civil and criminal penalties associated with transactions by ERISA and related tax laws. Foley had a copy of this memorandum sent to Mett at his residence.

While on the stand, Foley testified as to the contents of these two memoranda, and provided the foundation for their admission into evidence. Foley also recalled speaking to Mett and Wiseman regarding the advice contained in the two memoranda. He also testified that he advised both defendants that they could not continue to serve as ERISA trustees once convicted of a felony. In addition, Foley confirmed that the August 19 memorandum put the defendants on notice that the pension plan withdrawals needed to be disclosed to the IRS on Form 5500. Finally, Foley revealed that his firm had been forced to withdraw from representation of the ERISA plans on three separate occasions in light of the defendants persistent failure to submit annual Form 5500s to the IRS and the potential conflict of interest arising from the pension plan withdrawals.

## B. Analysis

"[T]he attorney-client privilege is, perhaps, the most sacred of all legally recognized privileges." *Bauer*, 132 F.3d at 510. The privilege is intended to encourage full and frank communication between attorneys and their clients. In the words of the Supreme Court, "[t]he privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

■ The Ninth Circuit, however, has joined a number of other courts in recognizing a "fiduciary exception" to the attorney-client privilege.[8] *See United States v.*

---

**7.** Neither Foley nor his firm represented the defendants in connection with the instant criminal prosecution.

**8.** *But see Huie v. DeShazo*, 922 S.W.2d 920, 923–26 (Tex.1996) (refusing to recognize a fiduciary exception to the attorney-client privilege).

*Doe,* 162 F.3d 554, 556–57 (9th Cir.1998); *United States v. Evans,* 796 F.2d 264, 265–66 (9th Cir.1986). This exception had its genesis in English trust law, but has since been applied to numerous fiduciary relationships. *See generally* Charles F. Gibbs & Cindy D. Hanson, *The Fiduciary Exception to a Trustee's Attorney/Client Privilege,* 21 ACTEC NOTES 236 (1995). As applied in the ERISA context, the fiduciary exception provides that "an employer acting in the capacity of ERISA fiduciary is disabled from asserting the attorney-client privilege against plan beneficiaries on matters of plan administration." *Becher v. Long Is. Lighting Co. (In re Long Is. Lighting Co.),* 129 F.3d 268, 272 (2d Cir. 1997).

The fiduciary exception is rooted in two distinct rationales. *See generally* Rust E. Reid, William R. Mureiko & D'Ana H. Mikeska, *Privilege and Confidentiality Issues When a Lawyer Represents a Fiduciary,* 30 REAL PROP. PROB. & TR. J. 541 (1996). First, some courts have held that the exception derives from an ERISA trustee's duty to disclose to plan beneficiaries all information regarding plan administration. *See, e.g., Long Is. Lighting,* 129 F.3d at 271–72. Viewed in this light, the fiduciary exception can be understood as an instance of the attorney-client privilege giving way in the face of a competing legal principle. Other courts have focused instead on the role of the trustee and have endorsed the notion that, "as a representative for the beneficiaries of the trust which he is administering, the trustee is not the real client in the sense that he is personally being served." *Evans,* 796 F.2d at 266 (quoting *Washington-Baltimore Newspaper Guild, Local 35 v. Washington Star Co.,* 543 F.Supp. 906, 909 (D.D.C.1982)). Understood in this fashion, the fiduciary exception is not an "exception" to the attorney-client privilege at all. Rather, it merely reflects the fact that, at least as to advice regarding plan administration, a trustee is not "the real client" and thus never enjoyed the privilege in the first place. *See Evans,* 796 F.2d at 266.

On either rationale, however, it is clear that the fiduciary exception has its limits—by agreeing to serve as a fiduciary, an ERISA trustee is not completely debilitated from enjoying a confidential attorney-client relationship. For example, the seminal English opinion from which the fiduciary exception sprang distinguished between two items of legal advice: one dispensed to trustees prior to any threat of suit, advising them regarding the propriety of paying advances to the children of the testator, and one dispensed after the commencement of suit, aimed at advising them "how far they were in peril." *Talbot v. Marshfield,* 12 L.T.R. 761, 762 (Ch. 1865). The English court required the trustees to produce the first item, but not the second. *See id.; see also* RESTATEMENT (SECOND) of TRUSTS § 173, comment b (a trustee "is privileged to refrain from communicating to the beneficiary opinions of counsel obtained by him at his own expense and for his own protection").

The leading American case, *Riggs National Bank v. Zimmer,* 355 A.2d 709 (Del. Ch.1976), which imported the hoary English fiduciary exception precedents to our shores, also implicitly recognized the limits on the exception. In that case, the beneficiaries brought suit against the estate trustees for alleged breaches of the trust in regard to certain tax matters. During the litigation, the beneficiaries sought production of a legal opinion secured by the trustees in connection with potential tax litigation on behalf of the trust with the Delaware Division of Revenue. Although the court required production of the legal opinion, reasoning that the trustees were not the "real clients," it was careful to note that the legal advice "was prepared ultimately for the benefit of the beneficiaries of the trust *and not for the purpose of the trustees' own defense* in any litigation against themselves." *Id.* at 711 (emphasis added). In the words of the court,

At the time [the legal advice] was prepared the litigation which was then pending was a petition for instructions, the very nature of which normally indicates that the trustees were not implicated in any way.

*Id.*

■ Thus, the case authorities mark out two ends of a spectrum. On the one hand, where an ERISA trustee seeks an attorney's advice on a matter of plan administration and where the advice clearly does not implicate the trustee in any personal capacity, the trustee cannot invoke the attorney-client privilege against the plan beneficiaries. On the other hand, where a plan fiduciary retains counsel in order to defend herself against the plan beneficiaries (or the government acting in their stead), the attorney-client privilege remains intact.

■ On which side of the spectrum do the Foley memoranda fall? [9] The burden of answering this question falls properly on the government. *See Bauer,* 132 F.3d at 509 (government has the burden of showing crime-fraud exception to attorney-client privilege).

■ Both the context and content of the Foley memoranda indicate that they ought to have been treated as privileged matter. As for the context of the legal advice, it came in the midst of CAG's financial crisis and hard on the heels of the federal investigation that resulted in the defendants' conviction for art fraud. Although no legal action was then pending against the defendants in connection with the pension plans, CAG employees had begun asking difficult questions regarding the financial condition of the plans. Trouble was in the air. The defendants thus had good reason to seek advice from Foley regarding their personal exposure to additional civil and criminal liabilities arising from the pension plan withdrawals.

It is the content of the memoranda themselves, however, that forecloses the application of the fiduciary exception. The memoranda were plainly "defensive on the trustees' part," *Riggs,* 355 A.2d at 711, and aimed at advising the trustees "how far they were in peril," *Talbott,* 12 L.T.R. at 762. The first two paragraphs of the August 19 memorandum make it clear that the advice rendered was not "on a matter of plan administration." The advice is certainly a far cry from advice regarding whether a trust may advance to a beneficiary from the trust, *see id.,* or whether a trust should take certain positions in tax litigation with a state department of revenue, *see Riggs,* 355 A.2d at 711. Rather, the August 19 memorandum is devoted entirely to advising Mett and Wiseman regarding their own personal civil and criminal exposure in light of undocumented withdrawals that had already occurred. In short, unlike *Doe* and *Evans,* the advice here was not prepared for the benefit of the plan or the beneficiaries, nor was it advice regarding administration of the plan. *See Doe,* 162 F.3d at 557 ("Doe does not contest the fact that the attorney only represented Doe in his role as trustee for the fund and that the communications at issue concerned the administration of the fund."); *Evans,* 796 F.2d at 265 (attorney represented client "only in his capacity as plan trustee and not personally").

The government would prefer a more expansive interpretation of the fiduciary exception, arguing that the attorney-client privilege should be defeated whenever otherwise privileged legal advice "relates to" fiduciary matters. Certainly, Foley's advice to Mett and Wiseman could be viewed as "related to" the administration of the plan in the broadest sense. After all, the withdrawals from the pension plans could

---

9. As an initial matter, it is worth noting that, in the instant case, it is not the plan beneficiaries, but rather the government, that seeks access to the attorney-client communications. Our precedents, however, have extended the fiduciary exception to permit the government to assert the exception in the beneficiaries' stead when prosecuting malfeasance in ERISA plan administration. *See Doe,* 162 F.3d at 557 (citing *Evans,* 796 F.2d at 265).

be cast as a form of improper plan administration, and the Foley memoranda did "relate to" the improper withdrawals.

This expansive view of the fiduciary exception, however, must be rejected for at least four reasons. First, this view of the fiduciary exception threatens to swallow the entirety of the attorney-client privilege for ERISA trustees. After all, any legal advice concerning an ERISA plan could be construed as relating, at least indirectly, to the administration of the plan. On this view, the fiduciary exception could easily extend, for example, to communications between ERISA trustees and their trial counsel in a civil suit arising from a denied benefits claim, or even to the communications between the defendants here and their defense counsel. This is not the law. *See Wildbur v. ARCO Chemical Co.,* 974 F.2d 631, 645 (5th Cir.1992) (fiduciary exception not applicable to counsel retained for purpose of defending the lawsuit in question).

Second, the expansive view unmoors the fiduciary exception from its justifying rationales. When an ERISA trustee seeks legal advice for his own protection, the legal fiction of "trustee as representative of the beneficiaries" is dispelled, notwithstanding the fact that the legal advice may relate to the trustee's administration of the trust. Similarly, where a fiduciary seeks legal advice for her own protection, the core purposes of the attorney-client privilege are seriously implicated and should trump the beneficiaries' general right to inspect documents relating to plan administration.

■ Third, and most importantly, where attorney-client privilege is concerned, hard cases should be resolved in favor of the privilege, not in favor of disclosure. As the Supreme Court has repeatedly cautioned, "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Upjohn,* 449 U.S. at 393, 101 S.Ct. 677.

Finally, from a policy perspective, an uncertain attorney-client privilege will likely result in ERISA trustees shying away from legal advice regarding the performance of their duties. This outcome ultimately hurts beneficiaries—all else being equal, beneficiaries should prefer well-counseled trustees who clearly understand their duties. In addition, a trustee's fear that her lawyer will be used against her may well translate into either an unwillingness to serve at all, or an insistence on contractual protections aimed at diluting the trustee's accountability. Neither option serves the interest of beneficiaries.

■ In arguing that the Foley memoranda fall within the fiduciary exception, the government also points to an April 12, 1993 letter in which Foley describes the scope of his engagement as limited to representing CAG and the defendants in their roles as plan sponsor and fiduciaries. The government's reliance on this letter, however, is misplaced. First, Foley wrote the letter almost two years after authoring the memoranda at issue; the scope of the engagement in 1993 tells us little about the nature of the representation some two years before. *See Long Is. Lighting,* 129 F.3d at 272 (noting that the same attorney may advise an employer in both its fiduciary and nonfiduciary capacities at different times).

The government's argument, however, suffers from a more fatal flaw. As the Second Circuit recently pointed out in *Long Island Lighting,* the application of the fiduciary exception is not simply a question of conflict of interest, resolved "by multiplying the number of lawyers." *Id.* In other words, it is not the terms of an engagement letter, but rather the nature of the particular attorney-client communication that is dispositive. This communication-by-communication analysis, while perhaps untidy, is crucial if the attorney-client privilege and the fiduciary exception are to coexist. On the one hand, the attorney-client privilege demands that a communication, obtained for a trustee's

own protection, be shielded from disclosure. The force of this general proposition is undiminished, irrespective of whether the attorney consulted also did work for the plan. By the same token, the beneficiaries are entitled to inspect communications regarding plan administration, whether or not the attorney dispensing the advice is generally consulted regarding nonfiduciary matters. In the words of the Second Circuit, "[a]n employer's retention of two lawyers (one for fiduciary plan matters, one for non-fiduciary matters) would not frustrate a plan beneficiary's ability to obtain disclosure of attorney-client communications that bear on fiduciary matters." *Id.*

In the end, the government misconstrues the fiduciary exception as stating a "not one drop" rule—in their view, the fiduciary exception applies to all fiduciary-attorney communications *unless* the fiduciary can demonstrate that the advice was *solely* related to personal, non-fiduciary matters. This conception stretches the fiduciary exception far beyond its foundations, threatening to swallow the fiduciary's attorney-client privilege whole. The authorities suggest that the exception has a more modest reach: while the fiduciary exception does apply to advice on matters of plan administration, the attorney-client privilege reasserts itself as to any advice that a fiduciary obtains in an effort to protect herself from civil or criminal liability. Because the Foley memoranda come within the latter category, the district court erred in admitting the memoranda and Foley's related testimony into evidence.

### C. Was the error harmless?

█ Because the Foley memoranda and the testimony concerning those documents were admitted in error, we must determine whether the error was harmless:

> Because a violation of the attorney-client privilege is not an error of constitutional magnitude, the Government must show that the prejudice resulting from the error was more probably than not harmless. That requires the Government to show a "fair assurance" that the verdict was not substantially swayed by the error.

*Bauer*, 132 F.3d at 510 (internal citations omitted). Guided by our opinion in *Bauer*, we conclude that the error was far from harmless.

In *Bauer*, the defendant was convicted of concealing assets and making false statements in connection with his bankruptcy petition. *See Bauer*, 132 F.3d at 506. Bauer's sole defense was that he did not possess the requisite criminal intent for conviction, claiming that the omissions on his petition were the product of ignorance and mistake. *Id.* at 510. During the trial, the government called the defendant's bankruptcy attorney to testify that he had advised Bauer of a bankruptcy petitioner's duty to disclose all assets to the bankruptcy court. *Id.* at 507. Bauer's intent was the only real issue in dispute, and, in making its closing arguments, the government emphasized that he had been told by his attorney of his duty to disclose all his assets, and had ignored that advice. *Id.* at 512. In light of these facts, we held that the government had failed to demonstrate that the error was not harmless, and reversed Bauer's conviction. *Id.*

The parallels between *Bauer* and the instant case are striking. As in *Bauer*, the defense in the instant case turned on the issue of specific intent. As in *Bauer*, the government put the defendants' attorney on the stand in order to demonstrate that the defendants were advised that their conduct was illegal, and yet continued to engage in the prohibited activity. Tellingly, the government here elicited scienter information from Foley as to each of the counts against the defendants: Foley testified that he advised the defendants that (1) the pension plan withdrawals were "prohibited transactions" that might result in civil and criminal liability, (2) the failure to inform the IRS of these transactions would result in independent criminal liability, and

(3) the defendants were not permitted to serve as ERISA trustees in light of their convictions for art fraud. As in *Bauer*, the government in its closing argument emphasized the importance of the attorney's testimony as it related to the question of specific intent. Accordingly, as in *Bauer*, the testimony of the defendants' attorney "almost certainly sealed [Mett and Wiseman's] fate in the eyes of the jury." *Bauer*, 132 F.3d at 511.

Given the facts of this case, the error in admitting the Foley memoranda and related testimony cannot be considered harmless, or, put another way, it appears more likely than not that the jury may have been substantially swayed by the improper evidence. Accordingly, we reverse the convictions of the defendants on all counts and remand for a new trial or other appropriate disposition.

## II. Implied Authorization Defense

■ As noted earlier, the central issue at trial in connection with the embezzlement counts was whether the defendants possessed the requisite specific intent when they made the pension plan withdrawals. The defendants, borrowing from authorities rooted in union fund embezzlement cases brought under 29 U.S.C. § 501(c), sought to attack the government's scienter showing on two related fronts. First, they argued that the CAG employees, more concerned with the survival of the company than with illegal uses of their pension funds, implicitly authorized the pension fund withdrawals. Second, the defendants maintained that they had the best interests of the employees at heart. On this view, the withdrawals were intended to confer a benefit on CAG's employees, rescuing them from impending

unemployment. The parties and the district court struggled with the scope and viability of these "authorization" and "participant benefit" theories both in evidentiary rulings and in the formulation of jury instructions. In order to assist the district court on remand, we address the extent to which evidence relating to "authorization" or "participant benefit" is relevant to ERISA embezzlement charges under 18 U.S.C. § 664.

Congress enacted 18 U.S.C. § 664 [10] in order to "protect union and pension funds from any disbursement or conversion contrary to the statutes and instrument which control the management and disposition of those funds." *United States v. Andreen*, 628 F.2d 1236, 1243 (9th Cir.1980). While the statute by its terms includes conduct traditionally understood as embezzlement and conversion, it also reaches beyond these common law crimes and "imposes liability for an intentional breach of special fiduciary duties imposed by other regulatory statutes or governing instruments." *Id.* at 1241. Our precedent establishes that "[t]he essence of the crime is theft and in the context of ... pension funds the offense includes a taking or appropriation that is unauthorized, if accomplished with specific criminal intent." *Id.*

■ In this circuit, neither lack of authorization nor lack of good faith belief in union benefit is an essential element of union fund embezzlement under 29 U.S.C. § 501(c). *See United States v. Thordarson*, 646 F.2d 1323, 1332 (9th Cir.1981). We see no reason to announce a different rule in the ERISA pension fund context. *See Andreen*, 628 F.2d at 1242 (29 U.S.C. § 501(c) and 18 U.S.C. § 664 use similar language and should be given similar inter-

10. 18 U.S.C. § 664 provides that:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected

therewith, shall be fined under this title, or imprisoned not more than five years, or both.

As used in this section, the term "any employee welfare benefit plan or employee pension benefit plan" means any employee benefit plan subject to any provision of title I of the Employee Retirement Income Security Act of 1974.

pretations); *accord United States v. Nolan*, 136 F.3d 265, 269 (2d Cir.) (same), *cert. denied*, —— U.S. ——, 118 S.Ct. 2307, 141 L.Ed.2d 165 (1998). Nevertheless, we have recognized in both the pension fund and union fund contexts that facts pertaining to authorization and benefit (whether to plan participants or the union) may be relevant to intent. *See Thordarson*, 646 F.2d at 1336; *Andreen*, 628 F.2d at 1242. We have even gone so far as to say that, in the right case, "these factors may be crucial in determining the defendant's intent." *Thordarson*, 646 F.2d at 1336.

The trouble is that the defendants' "authorization" and "participant benefit" arguments here depend on authorization from the wrong source and benefit of an improper variety. In the words of one treatise, "[a] fundamental tenet of ERISA policy is that pensions earned in fact be available at retirement." ABA SECTION OF LABOR AND EMPLOYMENT LAW, EMPLOYEE BENEFITS LAW 168 (1991). This goal requires that employees be protected not only from unscrupulous trustees and administrators, but also from themselves. ERISA plans must, therefore, contain an "anti-alienation" provision, providing that participants may not assign or alienate their benefits, except in certain special circumstances. *See* ERISA § 206(d) (codified at 26 U.S.C. § 401(a)(13)). In light of this anti-alienation principle and our understanding of the purposes of ERISA generally, we conclude that those who embezzle from ERISA pension funds cannot argue that their otherwise illegal transactions were "authorized" by the plan participants because the participants themselves lack the legal power to "authorize" such a diversion of pension monies. Consequently, when a pension fund embezzler argues that the plan participants "authorized" the embezzlement, it is little different from arguing that complete strangers "authorized" the illicit transactions. This sort of evidence is simply irrelevant to the scienter inquiry required to support a conviction under 18 U.S.C. § 664.[11]

 The "participant benefit" theory fares no better. Once contributions have entered into an ERISA pension plan, the funds are committed to securing a particular *long-term* benefit—the payment of pension benefits. Mett and Wiseman suggest that their intent to substitute an alternate, short-term benefit—the prospect of continued employment—should immunize them from embezzlement liability. We disagree. We are confident that Congress, by imposing strict fiduciary responsibilities on ERISA trustees and enacting 18 U.S.C. § 664, meant to impose criminal liability on employers who willfully arrogate to themselves the authority to sacrifice an employee's pension in favor of short-term benefits of their own devising.

 We do not disturb the general rule: in both the pension fund and union fund contexts, facts pertaining to authorization and benefit (whether to plan participants or the union) may be relevant to the question of intent. *See Thordarson*, 646 F.2d at 1336; *Andreen*, 628 F.2d at 1242. Based on the facts of this case, however, we are satisfied that the defendants' authorization and participant benefit theories do not come within the bounds of this general rule.

---

11. We are not persuaded that *United States v. Todd*, 108 F.3d 1329 (11th Cir.1997), requires a different result. In *Todd*, a case decided on facts nearly identical to the case at bar, the Eleventh Circuit reversed an embezzlement conviction because the defendant had been prevented from developing an authorization defense. The court stressed, however, that it accepted the availability of the defense only because the government had recognized and acknowledged it before the district court. *See id.* at 1333. Accordingly, the appellate court was not called upon to pass upon the prior question—whether a defense premised on participant authorization is viable in ERISA pension fund embezzlement cases. This is the question that we answer today in the negative. To the extent *Todd* can be read to support the opposite conclusion, we respectfully disagree and echo the concerns voiced by the dissent. *See id.* at 1335 n. 1 (Kravitch, J., dissenting).

## CONCLUSION

For the foregoing reasons, we RE-VERSE Mett and Wiseman's convictions on all counts and REMAND for a new trial.