PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HILDA L. SOLIS, Secretary of
Labor, United States Department
of Labor,
              *Petitioner-Appellee,*

v.

THE FOOD EMPLOYERS LABOR
RELATIONS ASSOCIATION AND UNITED
FOOD AND COMMERCIAL WORKERS
PENSION FUND; THE FOOD
EMPLOYERS LABOR RELATIONS
ASSOCIATION AND UNITED FOOD AND
COMMERCIAL WORKERS HEALTH AND
WELFARE FUND,
              *Respondents-Appellants.*

No. 10-1687

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Senior District Judge.
(1:10-cv-00629-JFM)

Argued: March 22, 2011

Decided: May 4, 2011

Before NIEMEYER and DAVIS, Circuit Judges,
and Ronald Lee GILMAN, Senior Circuit Judge of the
United States Court of Appeals for the Sixth Circuit,
sitting by designation.

Affirmed by published opinion. Judge Davis wrote the opinion, in which Judge Niemeyer and Senior Judge Gilman concurred.

---

**COUNSEL**

**ARGUED:** Barry Steven Slevin, SLEVIN & HART, PC, Washington, D.C., for Appellants. Ashton Schoonover Phillips, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Appellee. **ON BRIEF:** Sharon M. Goodman, Sarah E. Sanchez, SLEVIN & HART, PC, Washington, D.C., for Appellants. M. Patricia Smith, Solicitor of Labor, Timothy D. Hauser, Associate Solicitor for Plan Benefits Security, Elizabeth Hopkins, Counsel for Appellate and Special Litigation, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Appellee.

---

**OPINION**

DAVIS, Circuit Judge:

This appeal arises out of the district court's grant of a petition by the Secretary of the United States Department of Labor ("DOL") to enforce administrative document subpoenas. The Secretary served the subpoenas on two multiemployer employee benefit plans, the Food Employers Labor Relations Association and United Food and Commercial Workers Pension Fund ("Pension Fund") and the Food Employers Labor Relations Association and United Food and Commercial Workers Health and Welfare Fund ("Health Fund") (collectively the "Funds"), as part of an investigation undertaken pursuant to § 504(a)(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1134(a)(1), into possible mismanagement of fund assets. Claiming attorney-client and work product privileges, the

Funds objected to the production of some responsive documents. After the Secretary sought judicial enforcement of the subpoenas, the district court ordered the Funds to produce the withheld documents, applying the fiduciary exception to the claimed privileges. The Funds timely appealed. Finding no error in the district court's order enforcing the subpoenas, we affirm.

I.

The DOL investigation into the management of the Funds arises out of a $10.1 million loss of ERISA plan assets as a result of the Funds' investments in entities related to Bernard L. Madoff, who has since been convicted of securities fraud for organizing a multi-billion dollar Ponzi scheme.[1]

Specifically, the Funds indirectly invested in Bernard L. Madoff Investment Securities, LLC ("BMIS"), Madoff's investment firm. According to affidavits provided by the Funds, the Board of Trustees for the Pension Fund interviewed a number of investment hedge fund of funds[2] in May 2004. The Board discussed the options with the Fund's investment consultants and decided to accept the consultants' recommendation to invest approximately three percent of the Fund's assets in the Meridian Diversified ERISA Fund Ltd. ("Meridian Fund"). The Meridian Fund's investment manager in turn invested a portion of those assets in the Rye Broad Market XL Portfolio Limited Fund. The investment advisors for the Rye Broad Market Fund hired BMIS to manage a portion of the Rye Broad Market Fund's assets. As of December 31, 2008, of the Pension Fund's $675 million in assets, approximately $41 million, or 6%, was invested in the Merid-

---

[1]*See Judgment* (Doc. #100), *United States v. Madoff*, Action No. 1:09-CR-0213-DC (S.D.N.Y. June 16, 2009). Madoff was the founder of Bernard L. Madoff Investment Securities, LLC.

[2]A hedge fund of funds is an investment vehicle with shares in multiple hedge funds, usually in order to diversify risk.

ian Fund, of which approximately $2.5 million, or 0.4% of the Pension Fund's total assets, was invested in the Rye Broad Market Fund.

In a similar fashion, in May 2005, the Board of Trustees of the Health Fund, based on the recommendation of its investment consultant, invested $29 million in the Meridian Fund. As with the assets of the Pension Fund, the Meridian Fund invested a portion of the Health Fund's assets in the Rye Broad Market Fund, of which BMIS managed a portion. As of December 31, 2008, of the Health Fund's $97.5 million in assets, $7.6 million, or 7.8%, was invested in the Meridian Fund, of which $500,000, or 0.5% of the Health Fund's total assets, was invested in the Rye Broad Market Fund. As a result of losses associated with these Madoff-related investments, the Funds are members of a plaintiff-class in a suit against Meridian.

DOL's Employee Benefit Security Administration ("EBSA") conducts audits pursuant to § 504(a)(1) of ERISA, which authorizes DOL to investigate whether a violation of Title I of ERISA or regulations or orders issued thereunder has occurred or is about to occur. 29 U.S.C. § 1134(a)(1). On April 15, 2009, DOL issued two subpoenas duces tecum requesting documents relating to the administration of the Funds. The request covered a range of the Funds' activities, but focused on information concerning the decision to commit assets to Madoff-related investments.

On April 16, 2009, the Funds provided documents partially responsive to the subpoenas, but redacted portions of some documents and wholly withheld some others, claiming they were protected by attorney-client and work product privileges. DOL and the Funds negotiated over the next few months regarding the scope of the subpoenas. In response to the Funds' concerns, DOL agreed to limit the time period covered by the request and to narrow the scope of 29 of the 38 subpoena specifications. Throughout these discussions, EBSA

maintained that the Funds were not permitted to withhold documents based on attorney-client or work product privileges. The negotiations eventually broke down, however, and, on March 10, 2010, the Secretary filed a petition in federal district court to obtain compliance with the subpoenas.

Following briefing and a hearing, the district court granted the Secretary's petition on May 19, 2010. In reaching its decision, the district court applied the fiduciary exception to the privileges asserted by the Funds. The district court ordered the Funds to comply with the subpoenas and produce documents dealing with: (1) Board of Trustees and Policy Committee meeting minutes for the Funds; (2) documents referred to or distributed during these meetings; (3) notes taken at these meetings; (4) any correspondence relating to the Funds' Madoff-related investments; and (5) documents outside the four categories listed above that the Funds withheld based on privilege claims. In accordance with the Secretary's offer to exempt certain categories from production, the district court excluded the production of documents dealing exclusively with benefits disputes, benefits claims, subrogation agreements, delinquent contributions, withdrawal liability, or collection actions involving employers. The district court's order also excluded information covered by the attorney-client privilege or work product protection in documents dated after service of the subpoenas or prepared in connection with the current investigation.

Notably, the district court addressed the Funds' concerns about the ability of third parties to access the information disclosed in response to the subpoenas, finding that "compliance with [the] Order does not waive any attorney-client or work product privilege with respect to any third party" and ordering DOL to notify the Funds of any requests received under the Freedom of Information Act, 5 U.S.C. § 552, for documents produced under the order. J.A. 85. The Funds produced the documents required by the district court's order and filed a

timely notice of appeal. The Funds seek reversal of the district court's order and the return of the privileged documents.[3]

## II.

Recognizing that Congress delegated enforcement mechanisms to agency discretion, this court has emphasized that the district court's role in a proceeding to enforce an administrative subpoena is "sharply limited." *EEOC v. City of Norfolk Police Dept.*, 45 F.3d 80, 82 (4th Cir. 1995) (internal quotation marks omitted); *see also EEOC v. Am. & Efird Mills, Inc.*, 964 F.2d 300, 303 (4th Cir. 1992). To enforce an administrative subpoena, the district court need only find that (1) the agency is authorized to make such an investigation; (2) the agency has complied with statutory requirements of due process; and (3) the materials requested are relevant. *See, e.g.*, *United States v. Am. Target Adver., Inc.*, 257 F.3d 348, 351 (4th Cir. 2001); *Am. & Efird Mills*, 964 F.2d at 302-03. If the agency can make such a showing, "the court must enforce the subpoena unless the party being investigated demonstrates that the subpoena is unduly burdensome." *EEOC v. Maryland Cup Corp.*, 785 F.2d 471, 475-76 (4th Cir. 1986) (citing *FTC v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977) (en banc)). This court reviews the factual findings underlying a district court's enforcement of an agency subpoena for clear error. *EEOC v. Lockheed Martin Corp., Aero & Naval Systems*, 116 F.3d 110, 113 (4th Cir. 1997). We review questions

---

[3]We note that the Funds' production of the documents in compliance with an administrative subpoena does not affect our jurisdiction over this appeal. *See Church of Scientology of California v. United States*, 506 U.S. 9, 15 (1992) (holding appeal that followed compliance with district court order enforcing IRS summons not moot because "if the summons were improperly issued or enforced a court could order that the IRS' copies of the tapes be either returned or destroyed"); *Reich v. National Eng'g & Contracting Co.*, 13 F.3d 93, 97-98 (4th Cir. 1993) (finding companies' continuing privacy interest in documents produced in compliance with district court order enforcing agency subpoenas ensured a live controversy on appeal from the order).

of law *de novo*. *See Maryland Cup Corp.*, 785 F.2d at 475-76 (internal citations omitted).

On appeal, the Funds do not challenge the Secretary's authority to issue the subpoenas; nor do they raise due process or relevance concerns. Instead, they argue that the attorney-client and work product privileges protect some of the materials requested by the Secretary from disclosure and that the district court erred in applying the fiduciary exception to override these privileges. This court reviews *de novo* a district court's decision regarding the scope and applicability of an asserted privilege "to the extent the court's holding rests on application of controlling legal principles to the facts." *In re Allen*, 106 F.3d 582, 601 (4th Cir. 1997); *see also In re Grand Jury Subpoena*, 341 F.3d 331, 334 (4th Cir. 2003). We address in turn the Funds' claims of attorney-client and work product privilege.

A.

Intended to encourage "full and frank communication between attorneys and their clients," the attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Nonetheless, the privilege is not absolute, and this court has noted that it "is to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *United States v. Aramony*, 88 F.3d 1369, 1389 (4th Cir. 1996) (internal citations and quotation marks omitted).

Courts have recognized one such limit in the context of fiduciary relationships. Rooted in the common law of trusts, the fiduciary exception is based on the rationale that the benefit of any legal advice obtained by a trustee regarding matters of trust administration runs to the beneficiaries. Consequently, "trustees . . . cannot subordinate the fiduciary obligations owed to the beneficiaries to their own private interests under

the guise of attorney-client privilege." *Riggs Nat. Bank of Washington, D.C. v. Zimmer*, 355 A.2d 709, 714 (Del. Ch. 1976).

   This principle has been applied to fiduciary relationships beyond the traditional trust context. *See, e.g.*, *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103-04 (5th Cir. 1970) (balancing potential costs and benefits of disclosure to hold that, in shareholder derivative action against corporate officers, "availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance"). Several of our sister circuits, moreover, have recognized the exception to assertions of attorney-client privilege by ERISA fiduciaries. *See, e.g.*, *Bland v. Fiatallis N. Am. Inc.*, 401 F.3d 779, 787-88 (7th Cir. 2005) (recognizing fiduciary exception but finding it did not apply to communications relating to non-fiduciary actions, including amendments to plan benefits); *United States v. Mett*, 178 F.3d 1058, 1062 (9th Cir. 1999) (finding fiduciary exception applied in ERISA context, but did not extend to "any advice that a fiduciary obtains in an effort to protect herself from civil or criminal liability"); *United States v. Doe*, 162 F.3d 554, 557 (9th Cir. 1999) (applying fiduciary exception to claims of privilege in context of ERISA enforcement action); *Becher v. Long Island Lighting Co.*, 129 F.3d 268, 272 (2d Cir. 1997) (recognizing fiduciary exception to attorney-client privilege in ERISA context was limited to fiduciary matters); *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 645 (5th Cir. 1992) (recognizing fiduciary exception but finding it did not apply to communications that were "made for the purpose of defending the pending lawsuit and did not deal with plan administration"). *Cf. Wachtel v. Health Net, Inc.*, 482 F.3d 225, 234 (3d Cir. 2007) (describing evolution of fiduciary exception in ERISA context and finding exception did not reach communications of ERISA plan insurer with plan attorneys regarding benefit claims).

Analogizing the ERISA fiduciary's role to the role of the trustee at common law,[4] these courts have relied on one of two related rationales. Applying the reasoning of the Fifth Circuit in *Garner*, some courts have concluded that the ERISA fiduciary's duty to act in the exclusive interest of beneficiaries supersedes the fiduciary's right to assert attorney-client privilege. *See, e.g.*, *Bland*, 401 F.3d at 787; *Becher*, 129 F.3d at 271-72. Other courts, however, have reasoned that the ERISA fiduciary, as a representative of the beneficiaries, is not the real client in obtaining advice regarding plan administration and "thus never enjoyed the privilege in the first place." *Mett*, 178 F.3d at 1063 (internal citations omitted). *See Doe*, 162 F.3d at 556; *Wildbur*, 974 F.2d at 645; *Washington-Baltimore Newspaper Guild, Local 35 v. Washington Star Co.*, 543 F. Supp. 906, 909 (D.D.C. 1982). Under either rationale, "where an ERISA trustee seeks an attorney's advice on a matter of plan administration and where the advice clearly does not implicate the trustee in any personal capacity, the trustee cannot invoke the attorney-client privilege against the plan beneficiaries." *Mett*, 178 F.3d at 1064.

This court has not previously examined the fiduciary exception in the context of ERISA, though several district courts in this circuit have addressed the issue.[5] *See, e.g.*,

---

[4]Reading ERISA in light of common law trust principles comports with the Supreme Court's guidance on interpreting ERISA. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) (analyzing trust law to determine the appropriate standard under which to review an ERISA fiduciary's denial of benefits).

[5]We recognized the fiduciary exception in the context of a corporate shareholder derivative action in *Sandberg v. Virginia Bankshares, Inc.*, in which we adopted the Fifth Circuit's holding and rationale from *Garner*, and found that it "provide[d] a sound basis for balancing a corporation's need to communicate confidentially with its attorneys against the shareholders' interests as beneficiaries of a fiduciary relationship." 979 F.2d 332, 352 (4th Cir. 1992). However, the *Sandberg* opinion was vacated pursuant to a joint agreement by the parties in that case. 1993 WL 524680 (4th Cir. Apr. 7, 1993).

*Tatum v. R.J. Reynolds Tobacco Co.*, 247 F.R.D. 488, 495 (M.D.N.C. 2008) (recognizing "the existence of a fiduciary exception where an ERISA plan administrator asserts attorney-client privilege to withhold from plan beneficiaries communications related to matters on which a fiduciary duty is owed to the beneficiaries"); *Coffman v. Metro. Life Ins. Co.*, 204 F.R.D. 296, 299 (S.D.W. Va. 2001) (finding that fiduciary exception required disclosure of documents dealing with plan administration to ERISA trust beneficiaries). Persuaded by the reasoning set forth in the opinions of our sister circuits and the lower courts within our circuit, we find that the fiduciary exception to attorney-client privilege extends to communications between an ERISA trustee and a plan attorney regarding plan administration.

In now recognizing the fiduciary exception, we acknowledge that it is not without limits. The exception will not apply, for example, to a fiduciary's communications with an attorney regarding her personal defense in an action for breach of fiduciary duty. *See Mett*, 178 F.3d at 1064. Similarly, communications between ERISA fiduciaries and plan attorneys regarding non-fiduciary matters, such as adopting, amending, or terminating an ERISA plan, are not subject to the fiduciary exception. *See Bland*, 401 F.3d at 787-88.

In the context of the shareholder derivative action, the fiduciary exception also has been limited by a requirement that one seeking to overcome a privilege show good cause. *See Garner*, 430 F.2d at 1101, n.17, 1103-04 (rejecting unqualified fiduciary exception out of concern, in part, that corporations may be "vulnerable to suit by shareholders whose interests or intention may be inconsistent with those of other shareholders"). In the context of the Secretary's investigative or enforcement activity under ERISA, however, the concerns that inspired the good cause requirement in the corporate context do not obtain, as "there exists no legitimate need for a trustee to shield his actions from those whom he is obligated to serve." *Washington Star*, 543 F. Supp. at 909, n.5; *see also*

*In re Occidental Petrol. Corp.*, 217 F.3d 293, 298 (5th Cir. 2000) (noting that the *Garner* court's concern regarding potential for conflicting interests in corporate context was "not triggered" where "plaintiffs seek discovery only to uphold Occidental's fiduciary duties to the [Employee Stock Ownership Plan]" of which plaintiffs are beneficiaries). *Cf. Martin v. Valley Nat'l Bank*, 140 F.R.D. 291, 326 (S.D.N.Y. 1991) (noting that "common-law principles governing required disclosure of trustee communications do not impose a 'good cause' limitation on the beneficiary's access to this type of information, and neither *Garner* nor its progeny offer the slightest suggestion as to why that long-settled principle ought now to be set aside"). Several other courts that have addressed the scope of the fiduciary exception in the ERISA context have also refused to apply a good cause requirement. *See Mett*, 178 F.3d at 1063 (applying fiduciary exception without reference to good cause requirement); *Wildbur*, 974 F.2d at 645 (same); *Becher*, 129 F.3d at 272 (same); *Tatum*, 247 F.R.D. at 495 (expressly rejecting *Garner's* good cause analysis); *Henry v. Champlain Enters., Inc.*, 212 F.R.D. 73, 83-86 (N.D.N.Y. 2003) (applying good cause requirement to plaintiffs' shareholder derivative claim but not to their ERISA claims); *Hudson v. Gen. Dynamics Corp.*, 186 F.R.D. 271, 274 (D. Conn. 1999) (finding good cause not required in ERISA context); *Washington Star*, 543 F. Supp. at 909 n.5 (same).[6] Indeed, to our knowledge, only one thirty-year-old

---

[6]The Funds' attempt to portray the good cause showing as governed by our decision in *Sandberg* is misplaced. Even apart from the fact that we vacated our *Sandberg* opinion, *Sandberg* arose in the context of a corporate shareholder derivative action. 979 F.2d at 352. As discussed *supra*, the application of the fiduciary exception in the ERISA context presents different concerns from those involved in the corporate context, and courts have continued to impose a good cause showing on the latter but not the former. Nor does our decision in *Faircloth v. Lundy Packing Co.*, 91 F.3d 648 (4th Cir. 1996), support the imposition of a good cause requirement here. *Faircloth* dealt with provisions in ERISA that require certain automatic disclosures, and made no mention of the fiduciary exception whatsoever. *Id.* at 655. Accordingly, it has little bearing on our determination of the scope of that exception.

district court opinion has applied the good cause requirement to limit the fiduciary exception in the ERISA context. *See Donovan v. Fitzsimmons*, 90 F.R.D. 583, 586-87 (N.D. Ill. 1981). We do not find that case persuasive.

Even courts that have refused to impose a good cause requirement, however, have maintained the limits imposed by the fiduciary relationship itself. In particular, non-fiduciary communications and a trustee's personal legal advice will not be subject to the exception. Thus, the application of the fiduciary exception to any particular communication remains a matter of "context and content." *Mett*, 178 F.3d at 1064; *Tatum*, 247 F.R.D. 495.

In sum, we conclude that application of the fiduciary exception to the attorney-client privilege in the context of a subpoena issued by the Secretary of Labor under ERISA does not require a showing of good cause; instead, its application turns on the context and content of the individual communications at issue.

Turning to the case before us, the Funds argue that the district court erred in applying the fiduciary exception to their claim of attorney-client privilege in the context of the Secretary's investigation. Courts have held, and the parties agree, that the fiduciary exception extends to the Secretary acting on behalf of beneficiaries in the context of an ERISA *enforcement action. See Doe*, 162 F.3d at 557 (recognizing that the government may invoke the exception "when it is seeking to vindicate the rights of ERISA beneficiaries"); *Mett*, 178 F.3d at 1064 n.9; *Valley Nat. Bank*, 140 F.R.D. at 325-26 (noting that "any communications by the Bank with the firm seeking advice as to the administration of the Trust should be disclosable to the Secretary, who is suing on behalf of the beneficiaries of the Trust"); *Fitzsimmons*, 90 F.R.D. at 586-87 (finding that "at this point, both DOL and the plan's participants have exactly the same interest, securing complete disclosure in order to ferret out and discover any past wrongdoing affecting

the Fund"); *Wsol v. Fiduciary Mgmt. Assoc., Inc.*, 1999 WL 1129100 (N.D. Ill. Dec. 7, 1999). Thus, although the Funds concede that the fiduciary exception may apply to lawsuits filed by DOL under § 502 of ERISA, they argue that it should not extend to a DOL compliance investigation under § 504 of ERISA.[7] We disagree.

Attempting to distinguish the Secretary's role under the two provisions, the Funds argue that, under § 504, the Secretary "acts as a regulator and not as a statutory designee seeking recovery on behalf of the Funds' participants." Appellant's Br. 20. The Funds note that the two actions "differ fundamentally in terms of evidentiary support, scope, and the availability of procedural safeguards." *Id.* at 22. Further, the Funds contend that, in a compliance audit, the Secretary's interests may not align with those of the plan's beneficiaries, speculating that a potential for greater risk of public disclosure of disclosed documents could harm beneficiary interests. The district court rejected these arguments, however, finding that the fiduciary exception applied in both contexts because "the timing of the proceeding [does not make] any difference." J.A. 81-82.

We can discern no principled basis on which to distinguish between enforcement actions and investigations in the application of the fiduciary exception; accordingly, we will not disturb the judgment of the district court.

---

[7]Section 504 authorizes the Secretary, "in order to determine whether any person has violated or is about to violate any provision of this subchapter or any regulation or order thereunder (1) to make an investigation, and in connection therewith to require the submission of reports, books, and records . . . ." 29 U.S.C. § 1134(a). Sec. 502 authorizes the Secretary to bring a civil action in order "(A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief. . . ." 29 U.S.C. § 1132(a)(5). At oral argument, counsel for the Funds conceded that the fiduciary exception would apply if the Secretary's request had come in the context of a § 502 enforcement action.

The Secretary's investigative role under § 504 is directly related to her enforcement powers under § 502. The Secretary correctly points out that, as a practical matter, effective enforcement actions under § 502 will very often depend on thorough investigations and audits under § 504. Furthermore, it is unclear how the interests the Secretary seeks to protect in an enforcement action differ from those protected in an investigation. In both, she seeks to protect the interests of the beneficiaries and to "secur[e] complete disclosure in order to ferret out and discover any past wrongdoing affecting the Fund." *Fitzsimmons*, 90 F.R.D. at 587. *See also Doe*, 162 F.3d at 557 (acknowledging that the government "stand[s] in the shoes of beneficiaries when it is *investigating* and prosecuting malfeasance in the administration of an ERISA fund" in grand jury proceedings) (emphasis added).[8] Contrary to the Funds' contention, the potential for public disclosure in the investigation context does not harm beneficiary interests any more than in the enforcement context. And, while the potential for disclosure under a Freedom of Information Act request may be somewhat burdensome, the Secretary has cited several available exceptions which make the likelihood of disclosure pursuant to such a request remote. Moreover, courts can fashion an order to preclude subsequent third-party waiver claims and minimize the risk of disclosure under FOIA, precisely as the district court did in this very case. J.A. 85. At bottom, the Funds' attempts to distinguish DOL actions under § 502 from § 504 are unpersuasive.

---

[8]While circumstances may arise in which the Secretary's interests no longer align with those of plan beneficiaries, that is not the case before us. *Accord Fitzsimmons*, 90 F.R.D. at 586-87 (accepting that the interests of the Secretary and the beneficiaries might diverge at some later date "with DOL more interested in establishing a broad precedent to deter pension plan maladministration and the beneficiaries more interested in securing maximum restitution to the Fund for the payment of benefits" but finding "no principled basis" for preventing the Secretary from invoking the fiduciary exception "given the identity of interests" in the case at bar).

Bolstering our conclusion is the Secretary's well-established subpoena power in the context of investigating potential ERISA violations. *See, e.g.*, *Donovan v. National Bank of Alaska*, 696 F.2d 678, 684 (9th Cir. 1983) (finding broad investigative purpose sufficient to enforce subpoena); *Donovan v. Shaw*, 668 F.2d 985, 989 (8th Cir. 1982) (recognizing that agency "need not make any factual showing that a law has been violated as a condition precedent to enforcement" of subpoena). Although the Funds argue that this broad investigatory subpoena power further distinguishes the Secretary's roles under § 502 and § 504, respectively, it instead appears to underscore that Congress, in both provisions, sought to provide the Secretary with a wide range of tools to protect the interests of beneficiaries and participants.

Finally, we note that the facts of this case support the district court's disposition. The documents which the Funds were required to disclose included Board of Trustee meeting minutes, handwritten notes distributed and taken during the meetings, and correspondence that concerned the Madoff-related investments. All of these documents appear clearly to relate to the Funds' administration, information which ERISA trustees have a fiduciary obligation to disclose in response to a subpoena from plan beneficiaries provided it does not involve a trustee's own legal defense.[9] *See Becher*, 129 F.3d at 271-72; *Wildbur*, 974 F.2d at 645; *see also Mett*, 178 F.3d at 1064 (recognizing this obligation extends to the government acting "in the beneficiaries' stead"). If the Funds are concerned that there are privileged documents not subject to the fiduciary exception in this array, they have failed to identify which documents should remain privileged and why. *See United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) (noting that burden rests with party claiming privilege to demonstrate its

---

[9]In this circuit, a beneficiary is entitled to disclosure *on demand*, i.e., without a subpoena, of only those materials listed in ERISA, 29 U.S.C. § 1024(b)(4). *See Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653-54 (4th Cir. 1996).

applicability to individual communications); *Tatum*, 247 F.R.D. at 493-95 (applying fiduciary exception to some, but not all, documents after examining detailed privilege log for "context and content"). Here, the Funds did not specify individual communications to which the privilege applied or submit a privilege log for the district court's assessment. Accordingly, the district court properly applied the fiduciary exception to the documents requested by the Secretary that related to fund administration.

Because we find that the fiduciary exception applies to the Funds' claims of attorney-client privilege and no good cause showing is required in the ERISA context, we find no error in the district court's order.

## B.

We turn next to the Funds' arguments concerning the attorney work product privilege. Distinct from the attorney-client privilege, the work product doctrine belongs to the attorney and confers a qualified privilege on documents prepared by an attorney in anticipation of litigation. *Hickman v. Taylor*, 329 U.S. 495, 509-14 (1947); *In re Grand Jury Proceedings, Thur. Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 348 (4th Cir. 1994); *Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 487 F.2d 480, 483, n.12 (4th Cir. 1973). "[M]aterials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes" do not constitute "documents prepared in anticipation of litigation" protected by work product privilege. *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992). As in the case of attorney-client privilege, the party claiming the protection bears the burden of demonstrating the applicability of the work product doctrine. *In re Grand Jury*, 33 F.3d at 353.

The Funds argue that the district court erred in finding that the fiduciary exception extends to require disclosure of mate-

rial covered by the work product doctrine.[10] In support of their contention, the Funds point to cases in which other courts have refused to apply the fiduciary exception to attorney work product. *See, e.g.*, *Jicarila Apache Nation v. the United States*, 88 Fed. Cl. 1, 11 (2009) (refusing to apply fiduciary exception to work product privilege in action by tribe against United States for alleged mismanagement of tribal trust funds); *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1423 (11th Cir. 1994) (refusing to apply exception in action by union members against union); *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1239 (5th Cir. 1982) (refusing to apply exception in shareholder derivative action because "mutuality of interest" that existed to support attorney-client privilege was destroyed once there was "sufficient anticipation of litigation to trigger the work product immunity"). The Funds also rely on our decision in *Sandberg*, in which we found that the fiduciary exception did not apply to work product protection in the context of a shareholder derivative action. 979 F.2d at 355, n.22. As we have noted, however, our decision in *Sandberg* was vacated, *see* 1993 WL 524680, and does not bind us. Moreover, *Sandberg*, along with the other cases cited by the Funds, did not arise in the ERISA context; rather, these cases involved corporate shareholder actions, union actions, and actions relating to federal tribal authorities. The relevance of these decisions to the application of the fiduciary exception to work product protection in the ERISA context is questionable at best.

As we explained in our discussion of attorney-client privilege *supra*, the ERISA context differs from the corporate context and more closely involves fiduciary duties owed directly to participants and beneficiaries. Applying the logic of com-

---

[10]The district court expressly excluded documents "prepared in connection with the Secretary's investigation of the Plans" and those prepared after March 24, 2009, in connection with the Meridian Fund litigation. J.A. 84. The Funds nevertheless contend that the district court's order reaches protected materials.

mon law trusts from which the fiduciary exception to the attorney-client privilege was extrapolated to the ERISA context, several courts have found that the exception similarly applies to the work product doctrine, reasoning that a trustee's attorney should not withhold work product from the actual client, i.e. the trust beneficiaries. *See Everett v. USAir Group, Inc.*, 165 F.R.D. 1, 5 (D.D.C. 1995) (finding that ERISA fund attorneys may not "shield their attorney work product from their own ultimate clients, the plan beneficiaries . . . insofar as [documents] were prepared in anticipation of litigation on behalf of the plan beneficiaries"); *Valley Nat'l Bank*, 140 F.R.D. at 320-21 (rejecting work product protection claim by ERISA fund attorneys in context of DOL suit on behalf of fund participants); *see also Cobell v. Norton*, 213 F.R.D. 1, 13 (D.D.C. 2003) (finding the work product doctrine "applicable only where the material is developed *exclusively* for purposes other than the benefit of trust beneficiaries, i.e., *solely* to aid in litigation") (emphases added). *Cf. Aull v. Cavalcade Pension Plan*, 185 F.R.D. 618, 626 (D. Colo. 1998) (finding that "when the documents at issue are related to allegedly improper actions of ERISA fiduciaries, discovery often is permitted despite a claim of work product privilege," but refusing to reach the issue of whether fiduciary exception applied); *Fitzsimmons*, 90 F.R.D. at 587-88 (requiring disclosure of attorney work product relating to ERISA trustees' investment decisions, subject to good cause showing, "lest the work-product immunity swallow up the [fiduciary] exception in its entirety"). These persuasive authorities demonstrate that there is no legitimate basis on which to distinguish between the two privileges in the application of the fiduciary exception in the ERISA context.

In any event, however, because of the way the Funds have chosen to litigate this action— by failing to provide privilege logs or identify the litigation for which specific documents were prepared— we see no reason to reach the issue of whether the work product doctrine is subject to the fiduciary exception. As the party claiming privilege, the Funds bear the

burden of demonstrating the applicability of the privilege to specific documents. *In re Grand Jury*, 33 F.3d at 353. Because the Funds have failed to carry their burden to demonstrate the applicability of the work product doctrine, we have no reason to disturb the district court's judgment.

## III.

For the foregoing reasons, the district court's order granting the Secretary's petition to enforce is

*AFFIRMED*.