**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK STEPHAN,

                  *Plaintiff-Appellant,*

              v.

UNUM LIFE INSURANCE COMPANY OF
AMERICA,

                  *Defendant-Appellee.*

No. 10-16840

D.C. No.
3:08-cv-01935-MHP

OPINION

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, Senior District Judge, Presiding

Argued and Submitted
December 8, 2011—San Francisco, California

Filed September 12, 2012

Before: Diarmuid F. O'Scannlain, Robert E. Cowen,* and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge O'Scannlain

---

*The Honorable Robert E. Cowen, Senior Circuit Judge for the Third
Circuit, sitting by designation.

11077

**COUNSEL**

Mark D. DeBofsky, Daley, DeBofsky & Bryant, Chicago, Illinois; Terrence J. Coleman and Brian H. Kim, Pillsbury & Levinson, LLP, San Francisco, California, for the appellant.

Anna M. Martin and Kevin G. Gill, Rimac Martin, P.C., San Francisco, California, for the respondent.

---

**OPINION**

BERZON, Circuit Judge:

In August 2007, just three months after he had begun a new job at Thomas Weisel Partners ("TWP"), Plaintiff-Appellant Mark Stephan ("Stephan") had a bicycling accident that resulted in a spinal cord injury, rendering him quadriplegic and thus permanently disabled. Stephan was insured under TWP's long-term disability insurance plan, underwritten and administered by Defendant-Appellee Unum Life Insurance Company ("Unum"). Stephan disputes Unum's calculation of his pre-disability earnings, upon which his disability benefits were based. In calculating his earnings, Unum included only Stephan's monthly salary but not his annual bonus. Stephan's earnings, and therefore his disability benefits, would be considerably higher if the bonus were included.

The central issue in this appeal is whether the bonus should have been counted. The district court reviewed Unum's decision and upheld Unum's benefit determination. The court also denied Stephan's motion to compel discovery of a series of internal memoranda created by Unum's in-house counsel regarding Stephan's claim. Stephan appeals from each of the district court's rulings.

We agree with the district court that the applicable standard of review is abuse of discretion. The district court also cor-

rectly held that because Unum was responsible both for evaluating benefits claims and paying them, it operated under a conflict of interest, which " 'must be weighed as a factor in determining whether there is an abuse of discretion' " (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 113 (2008)). However, in determining what weight ought to be given the conflict, the district court erred in three ways: First, it failed to apply the traditional rules of summary judgment to its analysis of whether and to what extent a conflict of interest impacted Unum's benefits determination. Second, it incorrectly held that certain internal memoranda between Unum's claims analyst and its in-house counsel were not discoverable. Finally, it did not take into account substantial evidence that Unum's conflict of interest "infiltrated the entire decision-making process" and therefore ought to be accorded "significant weight." *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 634 (9th Cir. 2009).

We remand to the district court to reconsider the impact of Unum's conflict of interest; correspondingly, what weight to accord the conflict in determining whether Unum abused its discretion; and ultimately whether Unum did indeed abuse its discretion in failing to include Stephan's bonus in his pre-disability earnings.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Plan

The long-term disability insurance policy ("the Plan") issued by Unum to TWP, Stephan's employer, "provide[d] financial protection" for TWP employees should they become disabled, by ensuring that disabled employees would continue to receive sixty percent of their monthly earnings up to a maximum of $20,000. The Plan authorized Unum to interpret its provisions and to determine claimants' eligibility for benefits.

## B.  Stephan's Claim

On April 18, 2007, TWP offered Stephan a position as Managing Director in its Institutional Sales department. Stephan's offer letter stated, in relevant part:

> Your salary rate will be $200,000 annually. Your salary will be paid semi-monthly, less payroll deductions and all required withholdings. You will be eligible to participate in Thomas Weisel Partners' discretionary bonus program. Although bonuses are generally discretionary, you will be guaranteed [a] $300,000 bonus for your first 12 months of employment, provided you perform at the level both you and we anticipate and that you have not voluntarily terminated your employment or been terminated for cause prior to the relevant payment dates.

When he accepted his new position, Stephan became insured under TWP's policy, underwritten by Unum.

Four months later, Stephan suffered a severe spinal cord injury in a bicycling accident, as a result of which he became quadriplegic. Shortly thereafter, he applied for disability benefits under the Plan. On December 3, 2007, Unum sent Stephan a letter stating that his disability claim had been approved and specifying that Stephan would receive disability benefits of $10,000 per month. Unum based this amount on Stephan's annual salary of $200,000 per year. Later that month, TWP paid Stephan the $300,000 bonus promised in his offer letter.

Stephan appealed Unum's benefits determination, arguing that his benefits should have been based not on his annual salary of $200,000 per year but on an annual income of $500,000 — his base salary plus the annual bonus guaranteed to him in his offer letter. In support of his appeal, Stephan pointed to the disability claim form submitted by TWP

Human Resources, which stated that Stephan's annual earnings were $500,000; the insurance premiums TWP paid Unum based on that rate of compensation; and Stephan's offer letter guaranteeing him a bonus of $300,000. Stephan also attached several additional documents to his appeal: He provided Unum a memo from TWP explaining that "in each month prior to the date of [Stephan's] disability, TWP recorded compensation expense, associated with the cash component of [his] guaranteed bonus payment"; another memo from TWP explaining how the company calculated its insurance premiums; and a letter from accountant and former Unum Director of Financial Assessment, Carol Poulin, analyzing Stephan's claim and finding that "Mr. Stephan's monthly income," on which his disability benefits should be based, "consists of both his pro-rated salary and pro-rated guaranteed bonus."

Unum rejected Stephan's appeal, maintaining "that the original basic monthly earnings calculation was correct." The letter from Unum rejecting Stephan's appeal observed:

> As Mr. Stephan began working in April and stopped working in August he did not work a full 12 months and it is apparent that TWP went outside their own employment agreement when [Stephan] received a bonus in December 2007. This is consistent with the information provided in a December 14, 2007 conference call with TWP representatives when they indicated that they intended to morally honor his contract.

Further, Unum stated that it did

> not appear [Stephan's] bonus was a true accrual as indicated by TWP. If it were truly an accrual, the bonus would have been paid monthly, which would have been reflected in [Stephan's] payroll records.

Unum noted that contrary to Stephan's claim that TWP paid insurance premiums on a salary of $500,000, Unum's "premium billing department confirmed that premiums for [Stephan's disability] coverage were based on earnings of $100,000; not his salary at the time of disability and not including any bonus." Finally, Unum rejected the analysis of accountant Carol Poulin. Poulin, Unum stated, did "not take into account the fact that [Stephan's] bonus [was] contingent on a level of performance over the 12 months of employment, which [Stephan] did not complete." "Accordingly," Unum continued, "we have determined that his analysis and conclusions are flawed."

## C.  Procedural History

This case was initially filed in the Superior Court of California and then removed by Unum to federal court. The district court resolved it in three stages.

First, the court ruled on the parties' cross-motions for summary adjudication regarding the standard of review to be applied to the case. Because the Plan contained a provision delegating discretionary authority over its interpretation to Unum, the court held that the proper standard of review was abuse of discretion. The court rejected Stephan's contention that the discretionary provision was void either because of a settlement agreement between Unum and the State of California or because it was in violation of California public policy.

In addition, the district court's initial decision held that, absent attorney-client privilege, certain memoranda between Unum's in-house counsel and the claims analyst responsible for Stephan's claim were discoverable, because they might help demonstrate whether and to what extent Unum was operating under a conflict of interest. The court withheld any determination, however, on whether the attorney-client privilege protects these documents pending briefing on the appli-

cability to the documents of the fiduciary exception to attorney-client privilege.

Second, after the parties briefed the issue, the district court ruled on the discoverability of these memoranda. Although the court assumed without deciding that the fiduciary exception to attorney-client privilege generally applies to wholly-insured ERISA plans such as TWP's, it held that the exception did not apply in this case, because "the interests of plaintiff and defendant had sufficiently diverged at the time the disputed memoranda were created." Therefore, it held, Unum need not produce the documents.

Finally, on cross-motions for summary judgment on the merits, the district court ruled that "Unum's conflict of interest did not weigh heavily upon its decision-making process in this case," and more generally, that Unum had not abused its discretion in excluding Stephan's bonus from its calculation of the monthly earnings upon which it based its disability payments. The court therefore granted Unum's motion for summary judgment, and denied Stephan's. This appeal followed.

## II.   STANDARD OF REVIEW

ERISA benefit determinations are reviewed *de novo*, unless the benefit plan provides otherwise. *Glenn*, 554 U.S. at 111. "Where the plan . . . grant[s] the administrator or fiduciary discretionary authority to determine eligibility for benefits, trust principles make a deferential standard of review appropriate." *Id.* (internal quotation marks, citations, and alteration omitted).

The benefit plan in this case delegates discretionary authority to Unum.[1] Stephan contends, however, that, for two rea-

---

[1]The plan states "Thomas Weisel Partners LLC is the Plan Administrator and named fiduciary of the Plan, with authority to delegate its duties." It further provides:

sons, the Plan's discretionary authority provisions must be disregarded and Unum's benefits determination reviewed *de novo*. First, Stephan maintains that the California Settlement Agreement, an agreement between Unum and the California Department of Insurance, prohibits the discretionary authority provision. Second, he argues the discretionary provision is contrary to California state law and therefore void. Both arguments fail.

## A. Background

Cal. Ins. Code § 10291.5(b) provides that the California Insurance Commissioner "shall not approve any disability policy for insurance or delivery in" California that does not meet certain requirements. In particular, § 10291.5(b)(1) prohibits the Commissioner from approving a policy

> [i]f the commissioner finds that it contains any provision, or has any label, description of its contents, title, heading, backing, or other indication of its provisions which is unintelligible, uncertain, ambiguous, or abstruse, or likely to mislead a person to whom the policy is offered, delivered or issued.

---

> In exercising its discretionary powers under the Plan, the Plan Administrator, and any designee (*which shall include Unum as a claims fiduciary*) will have the broadest discretion permissible under ERISA and any other applicable laws, and its decisions will constitute final review of your claim by the Plan. Benefits under this Plan will be paid only if the Plan Administrator or its designee (including Unum) decides in its discretion that the applicant is entitled to them.

(emphasis added). In addition, the certificate of coverage states "[w]hen making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy."

The Insurance Code provides not only that the Commissioner may deny approval to policies that do not meet this standard, but also that

> [t]he commissioner may withdraw approval of filing of any policy or other document or matter required to be approved by the commissioner, or filed with him or her, by this chapter when the commissioner would be authorized to disapprove or refuse filing of the same if originally submitted at the time of the action of withdrawal.

*Id.* § 10291.5(f). Finally, the Code states that any insurance policy issued

> on a form approved by the commissioner, and in accordance with the conditions, if any, contained in the approval, at a time when that approval is outstanding shall, as between the insurer and the insured, or any person claiming under the policy, be conclusively presumed to comply with, and conform to, this section.

*Id.* § 10291.5(k).

On February 27, 2004, the Commissioner issued a notice that it intended to withdraw approval of several insurance forms, including the form upon which TWP's long-term disability policy was written, because they contained discretionary authority provisions. Such provisions, the Commissioner explained, "render [a policy] 'fraudulent or unsound insurance' within the meaning of [California] Insurance Code § 10291.5" because they make insurance payments "contingent on the unfettered discretion of the insurer, thereby . . . rendering the contract potentially illusory." The notice stated that the withdrawal of approval would be effective within 91 days unless, within 30 days, an adversely affected insurer requested a hearing.

Unum requested such a hearing. After the hearing, the administrative hearing officer issued a proposed decision upholding the Commissioner's notice of withdrawal. The decision stated that the discretionary provisions included in the policies at issue "create[ ] a legal ambiguity and [are] likely to mislead the insured," in violation of Cal. Ins. Code § 10291.5. "In eliminating discretionary clauses in disability insurance policies," the decision reasoned, "the Commissioner is fulfilling the statute's direction that he is to assure that all insurance policies can be readily understood and interpreted." The Commissioner adopted the opinion, stating that it would take effect on April 22, 2005 "unless the affected insurers agree in writing before that date to amend all insurance product forms to delete all discretionary clauses or other language having the same legal effect."[2]

Unum filed a writ of mandate with the San Francisco Superior Court challenging the Commissioner's notice and his order adopting the hearing decision. On October 1, 2005, Unum and the California Department of Insurance reached a settlement agreement, the California Settlement Agreement ("CSA"). Pursuant to the CSA, Unum withdrew its writ of mandate and agreed to make various changes to its insurance forms.

## B.   California Settlement Agreement

### 1.

**[1]** The CSA requires Unum to

> discontinue use of a[ny] provision that has the effect of conferring unlimited discretion on [Unum] or other plan administrator to interpret policy language,

---

[2]Unum, as well as another affected insurer, eventually reached agreements with the State of California, and therefore the opinion and its underlying orders were subsequently vacated.

or requires an "abuse of discretion" standard of review if a lawsuit ensues . . . in any California Contract sold after the date set forth in Section V.

The Agreement defines "California Contract" as "a policy of disability income insurance . . . which is subject to the jurisdiction of and approved by the Department [of Insurance]." Section V of the CSA provides that

> [a]ny language having the effect of a "discretionary authority provision" . . . shall not be applied to any California Contract sold after the CSA Effective Date [November 1, 2005]. A "discretionary authority provision" shall not be included in any new policies issued as California Contracts or included in Summary Plan Descriptions (SPDs) in ERISA-related Plans generated or issued by the Company, after the CSA Effective Date so long as its omission from the policy form or SPD is consistent with what is permitted by applicable California statutory and case law. Discretionary authority provisions in existing California Contracts that were issued prior to the date of the Order of the Commissioner are not affected by the CSA.

Whereas the CSA provisions relating to discretionary authority apply to "policies sold after the CSA Effective Date," the CSA requires that other changes, such as, for example, exclusions for pre-existing conditions, "be made in all new policies" as well as all "in-force policies upon renewal after the CSA Effective Date." Thus, by its terms, the CSA distinguishes between changes, like the prohibition on discretionary authority provisions, that apply only to "new policies," and those that apply to both "new policies" and "policies upon renewal." Both parties interpret the CSA as providing that policies already extant on the CSA effective date and renewals of such policies are not subject to the Agreement's prohibition on discretionary authority provi-

sions, whereas new policies sold after the CSA Effective Date are subject to the prohibition.[3]

Stephan argues that the policy under which he was insured was a new policy, issued after the CSA Effective Date, and that therefore its discretionary authority provision is void. We disagree.

**2.**

**[2]** Unum first issued the relevant disability insurance policy to TWP in 1999, years before the effective date of the CSA. TWP renewed the policy annually. Between 1999 and 2007, the Plan was amended six times. The 2007 amendment stated that it "form[ed] a part of Group Policy No. 537429 001," the policy originally issued to TWP in 1999. It also stated that "[t]he entire policy is replaced by the policy attached to this amendment." The attached policy was the same as the previous version, issued in 2006, with the exception of a few changes to provisions that insurance companies are explicitly permitted to amend upon renewal without seeking permission of the Commissioner.[4] While the effective date of the amendment was listed as January 1, 2007, the policy as a whole retained its original effective date, June 11, 1999.

**[3]** Stephan contends that because the 2007 amendment stated that it "replaced" the previous policy, the 2007 contract cannot be understood as a renewal but must be viewed as an entirely new policy. Unum responds that the language does not indicate an intent to create a new policy, but rather was

---

[3]Although the CSA is not entirely clear on this point, we accept the parties' interpretation for purposes of this appeal.

[4]While the district court characterized the 2007 contract as containing "a few amendments," Unum states that there was only a single change to the policy between 2006 and 2007. The record is unclear as to whether there was a single change or a few changes, but the difference is unimportant. The changes were minimal and permitted under the California Insurance Code.

included simply to avoid confusion: Rather than requiring policyholders to read both the policy and any amendments, Unum inserted the amendments into the text of the policy, such that all policy information was contained in a single document. Reviewing the 2007 contract as a whole, we agree with Unum's characterization and hold that the policy under which Stephan was insured constituted a renewal within the meaning of the CSA.

First, as noted, any changes between the 2006 and 2007 policies were minimal and permitted under California law.

Second, the language of the amendment itself indicates that the policy to which it is attached is a renewal. The amendment states that "[t]he policy's terms and provisions will apply other than as stated in this amendment." Were the 2007 policy entirely new and not a renewal, this language would make little sense, as the reference to "the policy" would have no meaning. Furthermore, the repeated use of the word "amendment" in the 2007 contract indicates that it did not constitute a new policy, but rather a continuation of the old policy with minimal, permitted changes.

The amendment also states that "[t]his amendment forms *a part of* Group Policy No. 537429 001 issued to the Policy holder: Thomas Weisel Partners LLC," the policy issued to TWP in 1999, and that "[t]he effective date of *these changes* is January 1, 2007" (emphasis added). This language further confirms that the 2007 policy was not a renewal by indicating that while the *changes* were effective as of January 1, 2007, the remainder of the policy as a whole retained its original effective date. Indeed, the effective date of the policy continued to be listed as June 11, 1999.

The CSA refers to "existing California contracts" as those "*issued* prior to the Order of the Commissioner" (emphasis added). The retention of the 1999 effective date on the

amended policy is the strongest indicator that the policy was issued in 1999, prior to the CSA.

Overall, then, the language and structure of the 2007 contract, taken together, indicate that the original 1999 policy remained in effect. In support of his position to the contrary, Stephan relies on cases holding that "[t]he renewal of a policy is a new contract of insurance" (citing *Borders v. Great Falls Yosemite Ins. Co.*, 72 Cal. App. 3d 86, 94 (1977)). But the cases Stephan cites are context-specific and inapplicable to the question at issue here. As we noted above, the CSA explicitly differentiates between new policies and renewals. If all renewals constituted new policies under the CSA, the CSA's differentiation between the two would be meaningless. Stephan's reliance on cases where no such distinction was made is therefore misplaced.

[4] Because the language and structure of the 2007 policy clearly indicates that it is a renewal of the existing policy, initially effective June 11, 1999, its discretionary authority provisions are unaffected by the CSA.

## C.   California Public Policy

Stephan's alternative position is that in 2007, the inclusion of discretionary provisions in insurance polices violated California law and that any such provisions in the Plan are therefore void. This argument is also unavailing.

[5] Under California law, "insurance policies are governed by the statutory and decisional law in force at the time the policy is issued. Such provisions are read into each policy thereunder, and become a part of the contract with full binding effect upon each party." *Interins. Exch. of the Auto. Club of S. Cal. v. Ohio Cas. Ins. Co.*, 58 Cal. 2d 142, 148 (1962) (internal quotation marks omitted). This principle governs not only new policies but also renewals: Each renewal incorporates any changes in the law that occurred prior to the

renewal. *See Modglin v. State Farm Mut. Auto. Ins. Co.*, 273 Cal. App. 2d 693, 700 (1969); Steven Plitt, Daniel Maldonado & Joshua D. Rogers, *Couch on Insurance* § 29:43 (3d ed. 2010). So, even though the 2007 policy under which Stephan was insured was a renewal, it was nevertheless subject to any relevant California law in place at the time it was issued. The law in effect at the time of renewal of a policy governs the policy even if that law is subsequently changed or repealed. *See Interins. Exch. of the Auto. Club*, 58 Cal. 2d at 148-49.

[6] In 2007, there was no California statute explicitly prohibiting discretionary provisions. Stephan relies on Cal. Ins. Code § 10291.5(b) which provided then (and provides now) that

> [t]he commissioner shall not approve any disability policy for insurance or delivery in this state . . . [i]f the commissioner finds that it contains any provision, or has any label, description of its contents, title, heading, backing, or other indication of its provisions which is unintelligible, uncertain, ambiguous, or abstruse, or likely to mislead a person to whom the policy is offered, delivered or issued.

This reliance is misplaced.

As we explained above, the Commissioner's notice that he would withdraw approval from policies containing discretionary clauses, the administrative hearing officer's proposed decision approving such notice, and the Commissioner's order adopting that decision (together, "the Commissioner's decision" or "the decision") held that discretionary clauses create "uncertainty" about how a policy will be enforced and therefore what entitlements it ultimately guarantees. For that reason, the Commissioner decided such clauses render insurance policies "misleading and ambiguous" in violation of Cal. Ins. Code § 10291.5(b)(1).

This decision did not, as Stephan contends, render void all discretionary provisions contained in policies issued or renewed after it was made. Section 10291.5(b) does not directly void any policy or policy provision, even those that fail to conform with its strictures. Rather, § 10291.5(b) provides the Commissioner grounds for refusing to approve or withdrawing approval from any non-conforming policy. *See id.* § 10291.5(b)*; id.* § 10291.5(f). Specifically, the statute provides that any policies that are approved by the Commissioner and are "in accordance with the conditions, if any, contained in the approval . . . shall . . . be *conclusively* presumed to comply with, and conform to" § 10291.5. *Id.* § 10291.5(k) (emphasis added). Thus, "[r]egardless of whether the Insurance Commissioner should have approved the policy, an otherwise valid policy is a binding contract and governs the obligations of the parties until the Commissioner revokes his approval." *Peterson v. Am. Life & Health Ins. Co.*, 48 F.3d 404, 410 (9th Cir. 1995).

The policy form upon which the Plan was written was approved by the Department of Insurance in 1991.[5] After Unum and the California Department of Insurance reached a settlement agreement, the policy form was re-approved, subject to the terms of the CSA. As discussed above, because it was a renewal, the Plan could contain a discretionary author-

---

[5]Stephan argues that the policy was never approved by the Department of Insurance. For this proposition, Stephan relies on a letter from the Department stating that it had no record of approving the form issued to TWP, although it did have a record "of approving a similar form number." Unum submitted to the district court an affidavit from Bonita Williams, the Unum employee responsible for overseeing the filing and approval of insurance forms with state departments of insurance. Williams stated that the relevant form had indeed been approved, and that the Department could not locate the approval because the policy number had been inadvertently changed. The district court found that the policy form was approved. This factual finding is not clearly erroneous; we therefore affirm it. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 962 (9th Cir. 2006) (en banc).

ity provision and remain in compliance with the CSA. Because the Plan was approved by the Commissioner, under § 10291.5(k), it must be "conclusively presumed to comply with" California law.

**[7]** In sum, the Plan's discretionary authority provision did not violate the terms of the CSA, nor is the provision void under California law. We therefore review Unum's decision for abuse of discretion. *See Glenn*, 554 U.S. at 111.

## III.   CONFLICT OF INTEREST

As we have explained, because the Plan grants discretionary authority to Unum, we review Unum's benefits decision for an abuse of that discretion. *See Glenn*, 554 U.S. at 111; *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673 (9th Cir. 2011). Under this deferential standard, a plan administrator's decision "will not be disturbed if reasonable." *Conkright v. Frommert*, 130 S. Ct. 1640, 1651 (2010) (internal quotation marks omitted); *Salomaa*, 642 F.3d at 675 (internal quotation marks omitted). This reasonableness standard requires deference to the administrator's benefits decision unless it is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Salomaa*, 642 F.3d at 676 (internal quotation marks omitted).

This abuse of discretion standard, however, is not the end of the story. Instead, the degree of skepticism with which we regard a plan administrator's decision when determining whether the administrator abused its discretion varies based upon the extent to which the decision appears to have been affected by a conflict of interest. *Id.*

**[8]** Under ERISA, Unum has a duty to process claims "solely in the interests of the [plan's] participants and beneficiaries." *Glenn*, 554 U.S. at 106 (alteration in original) (inter-

nal quotation marks omitted). But because Unum "both decides who gets benefits and pays for them, . . . it [also] has a direct financial incentive to deny claims." *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 868 (9th Cir. 2008); *see also Glenn*, 554 U.S. at 105, 114-15; *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 966 (9th Cir. 2006) (en banc). Unum's dual role as plan administrator, authorized to determine the amount of benefits owed, and insurer, responsible for paying such benefits, creates a structural conflict of interest. *See Glenn*, 554 U.S. at 105, 114-15.

While not altering the standard of review itself, the existence of a conflict of interest is a factor to be considered in determining whether a plan administrator has abused its discretion. *Id.* at 108. The weight of this factor depends upon the likelihood that the conflict impacted the administrator's decisionmaking. Where, for example, an insurer has "taken active steps to reduce potential bias and to promote accuracy," the conflict may be given minimal weight in reviewing the insurer's benefits decisions. *Id.* at 117. In contrast, where "circumstances suggest a higher likelihood that [the conflict] affected the benefits decision," the conflict "should prove more important (perhaps of great importance)." *Id.*

The district court held that "Unum's conflict of interest did not weigh heavily upon its decision-making process in this case and therefore does not tip the scale towards a finding of an abuse of discretion." In reaching this conclusion, the district court erred by failing to apply traditional principles of summary judgment; denying Stephan's motion to compel discovery of certain internal memoranda between Unum's claim analyst and its in-house counsel; and ignoring evidence that Unum has a history of biased decisionmaking that indicates that its conflict of interest in this case ought to be given more weight.

## A.

Traditional summary judgment principles have limited application in ERISA cases governed by the abuse of discre-

tion standard. *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009). "Where," as here, "the abuse of discretion standard applies in an ERISA benefits denial case, a motion for summary judgment is," in most respects, "merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Id.* (internal quotation marks omitted).

**[9]** Consideration of a conflict of interest is, however, an exception to this feature of ERISA cases as "the traditional rules of summary judgment" do apply. *Id.* As to issues regarding the nature and impact of a conflict of interest, summary judgment may only be granted if after "viewing the evidence in the light most favorable to the non-moving party, there are [no] genuine issues of material fact." *Id.* (internal quotation marks omitted).

**[10]** Here, there is no indication that the district court viewed the evidence of bias in the light most favorable to Stephan. Rather, as in *Nolan*, "without evidentiary hearing or bench trial, the district court considered and rejected [Stephan's] bias argument by weighing the documentary evidence of bias, and ignoring the protections that summary judgment usually affords the non-moving party." *Id.* This was error.

**[11]** On remand, the district court may, but need not, hold a bench trial to determine the impact of Unum's conflict of interest. *See id.* Such a trial would ensure the "full bias inquiry" necessary to determine what weight to give a conflict of interest. *Id.* The district court may, however, rule once again on summary judgment if a renewed motion is made. But it must do so in accordance with the traditional summary judgment principles.

In particular, it should, where relevant, permit the admission of evidence outside the administrative record. Although, for the most part, judicial review of benefits determinations is

"limited to the administrative record" — that is, the record upon which the plan administrator relied in making its benefits decision — the evaluation of a conflict of interest is not so limited. *Id.* Evidence outside the administrative record is "properly considered" in determining the extent to which a conflict of interest affected an administrator's decision. *Id.*

Here, as explained further below, the district court should consider any relevant evidence about Unum's history of biased decisionmaking; any evidence that its decisionmaking was biased in this case, including the internal memoranda between Stephan's claim analyst and its in-house counsel; as well as any evidence that Unum took steps to reduce the potential impact of a conflict of interest, either in general or in this case. And, if considered on summary judgment, the district court should view the evidence in the light most favorable to the non-moving party. *Id.*

## B.

In an effort to demonstrate to the district court that Unum operated under a conflict of interest, Stephan sought to discover a series of internal memoranda created between December 2007 and February 2008 by Unum's in-house counsel, at the request of Unum's claims analyst. Stephan argues that although ordinarily such memoranda would fall under the attorney-client privilege, Unum is a fiduciary of TWP's ERISA plan, and therefore the fiduciary exception to the privilege permits his discovery of the memoranda.

The district court assumed without deciding that the fiduciary exception applied to wholly-insured ERISA plans like TWP's. But it held that the exception did not apply in this case because "the interests of plaintiff and defendant had sufficiently diverged at the time the disputed memoranda were created." We agree that the fiduciary exception applies to wholly-insured ERISA plans but disagree with the district court's holding that it is inapplicable here.

**1.**

**[12]** "As applied in the ERISA context, the fiduciary exception provides that an employer acting in the capacity of ERISA fiduciary is disabled from asserting the attorney-client privilege against plan beneficiaries on matters of plan administration." *United States v. Mett*, 178 F.3d 1058, 1063 (9th Cir. 1999) (internal quotation marks omitted). Although the Ninth Circuit has held that the fiduciary exception applies generally in the ERISA context, *see id.* at 1062-63, whether it applies to insurance companies in particular is a question of first impression in this Circuit.[6]

The justifications for excepting ERISA fiduciaries from attorney-client privilege apply equally to insurance companies. In particular, courts have cited two rationales for applying an exception to the attorney-client privilege to ERISA fiduciaries: "[S]ome courts have held that the exception derives from an ERISA trustee's duty to disclose to plan beneficiaries all information regarding plan administration." *Mett*, 178 F.3d at 1063. On this view, the attorney-client privilege is subordinated to the fiduciary's disclosure obligation. *See id.* (citing *In re Long Island Lighting Co.*, 129 F.3d 268, 271-72 (2d Cir. 1997)).

"Other courts have" reasoned that because the ERISA fidu-

---

[6]Although there is no Ninth Circuit precedent on this question, several other courts have considered it. The Third Circuit, the only Court of Appeals to address the issue, held that the fiduciary exception was inapplicable to insurance companies. *See Wachtel v. Health Net, Inc.*, 482 F.3d 225 (3d Cir. 2007). Every district court that has considered the question since, however, has rejected *Wachtel*'s approach and held that the fiduciary exemption does apply to insurance companies. *See, e.g.*, *Klein v. Nw. Mutual Life Ins. Co.*, 806 F. Supp. 2d 1120 (S.D. Cal. 2011); *Buzzanga v. Cigna*, No. 4:09-CV-1353, 2010 WL 1292162 (E.D. Mo. Apr. 5, 2010); *Smith v. Jefferson Pilot Fin. Ins. Co.*, 245 F.R.D. 45 (D. Mass. 2007). For the reasons we explain below, we agree with the rationale of these courts and reject the Third Circuit's conclusion.

ciary is "a representative for the beneficiaries of the trust which he is administering," it is not the fiduciary, but rather the plan beneficiary that is the "real client." *Mett*, 178 F.3d at 1063 (internal quotation marks omitted). On this view, the fiduciary exception is not really an exception at all. Attorney-client privilege is maintained; there is only a different understanding of the identity of the client. *Id.*

**[13]** Neither of these theories provides any basis for distinguishing ERISA trustees, to whom the Ninth Circuit has already extended the fiduciary exception, from insurance companies also serving in the role of ERISA fiduciary. The duty of an ERISA fiduciary to disclose all information regarding plan administration applies equally to insurance companies as to trustees.

ERISA has broad disclosure requirements: It requires that "every employee benefit plan . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133. Because "[t]he opportunity to review . . . pertinent documents is critical to a full and fair review," *Ellis v. Metropolitan Life Insurance Co.*, 126 F.3d 228, 237 (4th Cir. 1997), the regulations implementing this provision require that upon request, a claimant be provided all "information relevant to the claimant's claim for benefits," 29 C.F.R. § 2560.503-1(h)(2)(ii). Neither the statute nor the regulations provide any reason why the disclosure of information is any less important where an insurer, rather than a trustee or other ERISA fiduciary, is the decisionmaker.

Similarly, the obligation that an ERISA fiduciary act in the interest of the plan beneficiary does not differ depending on whether that fiduciary is a trustee or an insurer. There is therefore no principled basis for excluding insurers from the fiduciary exception.

**2.**

The district court held that even if the fiduciary exception applies to wholly-insured ERISA plans, the particular documents requested by Stephan do not fall within this exception because they "were created after [Stephan's] counsel contacted Unum and an adversarial relationship had begun." After reviewing these documents *in camera*, we disagree.

"The fiduciary exception has its limits — by agreeing to serve as a fiduciary, an ERISA trustee is not completely debilitated from enjoying a confidential attorney-client relationship." *Mett*, 178 F.3d at 1063. *Mett* addressed these limits, considering whether the fiduciary exception applied to two memoranda written by a law firm that "wore many hats, serving at various times as counsel to [two ERISA trustees] personally and in their capacities as ERISA plan trustees, to [a corporation] as a corporation and in its role as plan administrator, and to the ERISA plans themselves." *Id.* at 1062. The memoranda were written to the trustees and "relate[d] to the potential civil and criminal consequences" the trustees might face due to illegal actions they had taken in administering an ERISA plan. *Id.*

In analyzing whether the documents fell within the fiduciary exception, *Mett* explained:

> [T]he case authorities mark out two ends of a spectrum. On the one hand, where an ERISA trustee seeks an attorney's advice on a matter of plan administration and where the advice clearly does not implicate the trustee in any personal capacity, the trustee cannot invoke the attorney-client privilege against the plan beneficiaries. On the other hand, where a plan fiduciary retains counsel in order to defend herself against the plan beneficiaries (or the government acting in their stead), the attorney-client privilege remains intact.

*Id.* at 1064. The memoranda at issue in *Mett*, we held, fell within the latter category. They were not rendering advice "on a matter of plan administration," but "were plainly defensive on the trustees' part and aimed at advising the trustees how far they were in peril." *Id.* (internal citations and quotation marks omitted).

Here, the documents sought fall on the other end of the *Mett* spectrum. The documents at issue are notes of conversations between Unum claims analysts and Unum's in-house counsel about how the insurance policy under which Stephan was covered ought to be interpreted and whether Stephan's bonus ought to be considered monthly earnings within the meaning of the Plan. Unlike the memoranda in *Mett*, the disputed documents offer advice solely on how the Plan ought to be interpreted. They do not address any potential civil or criminal liability Unum might face, nor is there any indication that they were prepared with such liability in mind.

Unum argues that, nevertheless, the fiduciary exception ought not apply to the documents because of the context in which they were created. The memoranda, Unum contends, "were all created after Unum had received correspondence from Stephan's counsel," and therefore after there was "an indication that the parties may become adverse." There is no binding precedent in this circuit delineating precisely when the interests of a Plan fiduciary and its beneficiary become sufficiently adverse that the fiduciary exception no longer applies. Courts that have considered the issue, however, "have repeatedly rejected the argument that the prospect of post-decisional litigation is enough to overcome the fiduciary exception." *Allen v. Honeywell Ret. Earnings Plan*, 698 F. Supp. 2d 1197, 1201 (D. Ariz. 2010) (internal quotation marks omitted); *see, e.g.*, *Geissal v. Moore Med. Corp.*, 192 F.R.D. 620, 625 (E.D. Mo. 2000); *Klein*, 806 F. Supp. 2d at 1132-33 (collecting cases). Most courts have held that it is not until after the final determination — that is, after the final administrative appeal — that the interests of the Plan fidu-

ciary and the beneficiary diverge for purposes of application of the fiduciary exception. *See Klein*, 806 F. Supp. 2d at 1132. We agree with the weight of authority. The context of the documents at issue here — communications in advance of Unum's decision on Stephan's appeal — indicates that their goal was the determination of Stephan's pre-disability earnings, a matter of plan administration, and was not preparation for litigation.

**[14]** The content of the documents confirms this conclusion. Whereas the *Mett* memoranda were prepared to advise ERISA trustees "regarding their own personal civil and criminal exposure in light of undocumented withdrawals that had already occurred," *Mett*, 178 F.3d at 1064, the documents here were prepared to advise Unum claims analysts about how best to interpret the Plan, and were communicated to the analysts before any final determination on Stephan's claim had been made. The content of the documents was thus about plan administration, a topic to which, under *Mett*, the fiduciary exception applies.

**[15]** In sum, advice on the amount of benefits Stephan was owed under the Plan, given before Unum had made any final determination on his claim, constitutes advice on plan administration. Such advice was given before the interests of Stephan and Unum became adverse. The fiduciary exception to the attorney-client privilege therefore applies to the documents at issue here. Absent some other basis for withholding them, the district court, on remand, should permit discovery of the documents.

## C.

**[16]** The Supreme Court instructed in *Glenn* that a "conflict of interest . . . should prove more important (perhaps of great importance) . . . where an insurance company administrator has a history of biased claims administration." *Glenn*, 554 U.S. at 117. In so stating, *Glenn* cited a law review article

"detailing such a history for one large insurer." *Id.* (citing John H. Langbein, *Trust Law as Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials Under ERISA*, 101 Nw. U. L. Rev. 1315, 1317-21 (2007)). That insurer was Unum. *Id.*

**[17]** Numerous courts, including ours, have commented on Unum's history " 'of erroneous and arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous tactics,' " *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 137 (2d Cir. 2008) (quoting *Radford Trust v. First Unum Life Ins. Co.*, 321 F. Supp. 2d 226, 247 (D. Mass. 2004), *rev'd on other grounds*, 491 F.3d 21, 25 (1st Cir. 2007)). Indeed, in *Saffon*, we attributed the trend of state prohibitions on discretionary provisions in insurance contracts to "the cupidity of one particular insurer, Unum-Provident Corp., which boosted its profits by repeatedly denying benefits claims it knew to be valid. Unum-Provident's internal memos revealed that the company's senior officers relied on ERISA's deferential standard of review to avoid detection and liability." 522 F.3d at 867; *see also Radford Trust*, 321 F. Supp. 2d at 247 n.20 (collecting cases). Moreover, the CSA notes that Unum was subject to "a multistate targeted examination" of its "claims handling practices," which resulted in a settlement agreement similar to the CSA. And the CSA was the product of investigations by the State of California into Unum's claims handling practices.

The district court held that Stephan had not "demonstrated 'a history of biased claims administration.' " Given the public record and the record in this case, that conclusion is incorrect.

Furthermore, Unum did not present any evidence indicating that it made any effort to mitigate its conflict of interest. Unum "was not *required* to present evidence demonstrating its efforts to achieve claims administration neutrality." *Montour*, 588 F.3d at 634. But "the Supreme Court's decision in [*Glenn*] placed it on notice as to the potential significance of

such evidence in defense of a suit by a claimant challenging an adverse benefits determination." *Id. Glenn* explained that a conflict of interest would

> prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

554 U.S. at 117. So far, Unum has presented no such evidence.

**[18]** In reconsidering the weight to accord to Unum's conflict of interest, the district court should take into account the public record of Unum's history of biased decisionmaking as well as any evidence of such history Stephan produces. In addition, it should allow Unum the opportunity to demonstrate that, before making the decision on Stephan's claim, it implemented procedures to mitigate possible bias.

### D.

As we have explained, on remand, the district court should reconsider what weight to give Unum's conflict of interest in its analysis of whether Unum abused its discretion. In particular, the court must determine whether the "conflict may have tainted the entire administrative decisionmaking process" and therefore the "stated bases for [Unum's] decision" ought to be reviewed "with enhanced skepticism." *Montour*, 588 F.3d at 631. Although we express no opinion on the ultimate outcome of this inquiry, we note that there are several aspects of Unum's decision that might well indicate that "bias infiltrated the entire decisionmaking process." *Id.* at 634.

**1.**

First, Unum's interpretation of the language of the Plan rests on terms that do not appear in the relevant text. The Plan entitled Stephan to sixty percent of his monthly earnings up to a maximum of $20,000. It specified that

> "Monthly Earnings" means your average gross monthly income as figured:
>
>> a. from the income box on your W-2 form which reflects wages, tips and other compensation received from your Employer for the two (2) calendar-years just prior to your date of disability; or
>>
>> b. for the period of your employment with your Employer if you have been employed less than two (2) full calendar years prior to your date of disability.
>
> Average gross monthly income is your total income before taxes. It is prior to any deductions made for pre-tax contributions to a qualified deferred compensation plan, Section 125 plan, or flexible spending account. It does not include income received from car, housing or moving allowances, Employer contributions to a qualified deferred compensation plan, or income received from sources other than your Employer.

As Stephan worked for less than a year before becoming disabled, his Plan benefit was to be calculated based on his "average gross monthly income . . . for the period of [his] employment" at TWP.

As noted above, in the letter offering Stephan employment, TWP provided:

> Your salary rate will be $200,000 annually. . . . You will be eligible to participate in Thomas Weisel Partners' discretionary bonus program. Although bonuses are generally discretionary, you will be guaranteed [a] $300,000 bonus for your first 12 months of employment, provided you perform at the level both you and we anticipate and that you have not voluntarily terminated your employment or been terminated for cause prior to the relevant payment dates.

The Plan is silent as to whether and how such a bonus ought to be included in Stephan's gross monthly earnings if he is disabled before the bonus is received.[7]

Unum insists that the "monthly earnings" upon which disability benefits are based must be limited to "earnings *received* up to the date of disability." But the language limiting earnings to income already "received" appears in section (a) of the definition, applicable after two years of employment, not in section (b), which applies to employees disabled after fewer than two years of work. As Stephan had worked for less than a year before becoming disabled, it is section (b) that applies to him. Section (b) contains no reference to when income is received. Unum's reliance on the term "received" to interpret section (b) is therefore misplaced.

Furthermore, Unum's interpretation would make arbitrary distinctions based on an insured's length of employment, dis-

---

[7]Citing *Arnold v. Unum Life Insurance Co. of America*, 726 F. Supp. 2d 1063 (N.D. Cal. 2009), Stephan notes that other insurance plans issued by Unum explicitly excluded bonuses from the definition of monthly earnings, and argues therefore that Unum's failure to do so here indicates that they are included. However, Unum also issued plans that explicitly included bonuses in the definition of monthly earnings. *See Hemenway v. Unum Life Ins. Co. of Am.*, 89 F. App'x 630, 631 (9th Cir. 2004). We therefore cannot draw any inference from the Plan's silence on how bonuses ought to be treated.

tinctions not supported by the text of the Plan. For example, if Stephan had become disabled the day he received his bonus, it would be included in the earnings upon which Unum's disability payments were based. But if he had become disabled one day before his first bonus was received, it would not be so included, even if he had worked for twelve months at an adequate level and his bonus was, therefore, guaranteed.

In addition, the Plan's definitions of "monthly earnings" and "gross monthly income" are the same — "total income before taxes" — regardless of how long an insured has been employed. Such earnings are not defined differently based on length of employment, but merely "*figured*" differently (emphasis added). On Unum's interpretation, however, for those employees who have received their bonuses, "total income" would include salary and bonuses. For those whose bonuses are guaranteed but have yet to be paid, such income would include salary only. This result is at odds with the policy's language, which defines monthly earnings without regard to length of employment.

Finally, interpreting "gross monthly income" to include only income actually received would mean that employees who became disabled before receiving their first paycheck would receive no disability payments at all. Similarly, the disability payments for an employee whose paycheck was incorrect — for example someone who had been accidentally underpaid due to a payroll error or intentionally underpaid due to discrimination — would be calculated based on this erroneous figure.

The district court "expresse[d] no opinion on these matters, and limit[ed] its holding to the facts of this action." But the Plan applies to all TWP employees, not merely Stephan, and Unum is required by law to ensure that "the plan provisions" are "applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-1(b)(5). Unum's interpreta-

tion of the Plan as limiting monthly earnings to income actually received either disregards this obligation or reaches an unsupportable result.

**2.**

Similarly, Unum relies on a questionable interpretation of Stephan's offer letter. As noted above, Stephan's offer letter provided that his compensation included a "*guaranteed* $300,000 bonus for [his] first twelve months of employment" (emphasis added). Stephan's bonus was thus a nondiscretionary part of his income, so long as he met the conditions of the offer letter. The letter required only that Stephan "perform at the level both [he and TWP] anticipate[d] and that [Stephan] not voluntarily terminate[ ] [his] employment or be[ ] terminated for cause prior to the relevant payment dates."

Unum decided that because Stephan "did not work a full 12 months . . . it is apparent that TWP went outside their own employment agreement when [Stephan] received a bonus in December 2007." Such a conclusion is far from clear from the language of the offer letter.

Stephan was certainly not "terminated for cause." Nor is it sensible to understand his inability to work due to disability as a voluntary termination of employment. And although the bonus was contingent on Stephan maintaining a particular level of performance in his first twelve months, the letter does not specify that level. Nor is there any indication that Stephan fell below any requisite performance standard. Finally, the letter does not indicate that periods of disability cannot count toward the requisite period of employment.

Moreover, the central question at issue in this case is not whether Stephan was entitled to *receive* his bonus in its entirety, but whether he *earned* it on a pro rata basis each month as part of his income. Unum's interpretation of the offer letter does not answer that question. In relying on Ste-

phan's offer letter, Unum thus relied on a contractual interpretation that is, at best, only weakly supported by the contractual language.

**3.**

In support of its decision, Unum repeatedly cited a telephone call during which TWP General Counsel Mark Fisher stated that TWP intended to "morally honor" Stephan's contract by paying him his annual bonus even though he had not yet worked twelve months. Unum argues that this statement indicates that TWP did not consider the bonus a portion of Stephan's income it was contractually obligated to pay; instead, Unum contends, TWP gave Stephan $300,000, none of which he was actually owed, out of sympathy for his situation.

Unum took this quotation out of context and then proceeded to give it undue weight in its determination of Stephan's pre-disability earnings. The text of the notes from which the quotation was drawn states more completely:

> Received a call from [TWP] . . . . They are going to continue payment and honor their contract with the claimant and continue his salary along with the bonus payment and they want a statement in writing that this wil[l] [n]ot affect the LTD bens [long-term disability benefits] and we will not consider this an offset to his earnings. *He says as their company is set up and the way most wall street corps are the main income ee's [employees] receive is from bonus* and the base salary is a set amount. They want a statement that continued payment of his contract they are going to morally honor will be treated as s[al]ary cont[inuation] and not affect his benefits.

(emphasis added). In contrast to Unum's implication, this conversation demonstrates that TWP understood Stephan's

bonus not as a discretionary addition to his income, but rather as an integral — in fact, the "main" — part of his payment for each month's work, despite the fact that it was not to be received until later. TWP's counsel therefore most probably meant not that it was giving Stephan his bonus to be charitable, but rather that it considered the bonus an essential part of Stephan's salary.

Other evidence in the record confirms that TWP understood Stephan's bonus as part of his monthly earnings, and therefore as earnings upon which disability payments ought to be calculated. For example, the claim form TWP submitted for Stephan listed as his "Salary/Wage prior to date last worked," a semi-monthly salary of $8,333.33 as well as a bonus of "$300,000 (for 2007)." And in the same conversation upon which Unum relies to support its earnings determination, TWP "also stated that they have an issue with the monthly earnings and the amount of ben[efit]s [Unum] will be paying."

Given the strong support in the record for the conclusion that TWP believed Unum's bonus to be part of his monthly earnings, Unum's reliance on TWP's statement that it would "morally honor" Stephan's contract as implying that TWP did not understand the bonus as part of Stephan's monthly income is "without support in inferences that may be drawn from the facts in the record," *Salomaa*, 642 F.3d at 676, and may indicate bias.

### 4.

In addition to mischaracterizing TWP's understanding of Stephan's bonus, Unum ultimately disregarded TWP's conclusion that the bonus ought to be included in the calculation of Stephan's pre-disability earnings. Unum also rejected the views of Carol Poulin, a Certified Public Accountant, who in his former positions as Manager and then Director of Financial Assessment at Unum,

was closely involved in developing the LTD [long-term disability] contract language for Basic Monthly Earnings definitions for the new LTD contract developed by UNUM in the 1990s — the same contract that Mr. Stephan [was] . . . covered under.

Relying on several documents related to Stephan's claim,[8] Poulin concluded that "Mr. Stephan's monthly income consists of both his pro-rated salary and pro-rated guaranteed bonus."

Unum rejected Poulin's conclusion because it did "not take into account the fact that the bonus is contingent on a level of performance over the first 12 months of employment, which [Stephan] did not complete." However, Poulin's report states that he reviewed Stephan's offer letter. Furthermore, as we have explained, Unum misreads the offer letter as specifying that the bonus was not part of Stephan's earnings.

Unum's failure to give any weight to Poulin's analysis and its distortion of TWP's views indicate that it failed to take into account relevant evidence, supporting the conclusion that its decisionmaking was affected by a conflict of interest.

**5.**

Unum repeatedly cited the premiums paid for Stephan as evidence that Stephan's bonus ought not be included as gross monthly earnings. The record makes clear, however, that Unum either did not in fact rely on the premiums or did so in a way that was illogical. In either case, Unum's citation of premium payments supports an inference of bias.

---

[8]Poulin reviewed Stephan's earnings statements, his 2007 W-2 form, memoranda from TWP to Stephan's attorney, Stephan's disability application, Stephan's employment offer letter, Unum plan documents, TWP's premium statement from Unum, and letters from Unum regarding Stephan's claim.

Because of what seems to have been a recordkeeping error, Unum believed for most of the benefits determination process that TWP had paid premiums for Stephan corresponding to an annual income of only $100,000. While still under the impression that TWP paid premiums based on a salary of $100,000, Unum found that Stephan was owed disability payments based on an annual salary of $200,000. Thus, Unum could not have initially relied on the premiums paid by TWP to determine Stephan's pre-disability earnings.

Nevertheless, once Unum confirmed that TWP paid premiums for Stephan based on a salary of $200,000, it began to justify its decision with reference to these premiums. This "shifting and inconsistent" reliance on premiums raises the possibility that Unum's decision was affected by its conflict of interest. *See Salomaa*, 642 F.3d at 678.

Furthermore, there is conflicting evidence in the record about how TWP paid its premiums and, therefore, to what extent the premiums accurately reflected the earnings of TWP employees. Unum's own review of TWP's premium payments was inconclusive, finding that there was not "sufficient information to be able to clearly determine if the earnings figures [on which premiums were paid] . . . are salary only or some combination of salary and bonus." Indeed, with respect to TWP's premiums, the only thing clear from the record is that they were not a reliable source of evidence of employees' actual earnings. The record notes, for example, "a significant adjustment [in premiums] in April of 2006, which does not appear to correspond to a significant increase in policy lives covered but may reflect an attempt to correct a historical underpayment of premiums" — that is, an adjustment of premiums entirely unrelated to the earnings of TWP employees.

Thus, Unum's reliance on TWP's premium payments was both inconsistent and illogical. That reliance therefore could be indicative of the impact of Unum's conflict of interest. *See Salomaa*, 642 F.3d at 678.

**6.**

Attached to the letter Stephan sent to Unum appealing its decision, Stephan provided a letter from TWP stating that each month, the company recorded a compensation expense equal to 1/12th of the cash amount of Stephan's annual bonus. In its letter rejecting Stephan's appeal, Unum stated that if Stephan's bonus payment truly accrued monthly, it would have been paid monthly. This assertion is incorrect. Companies that use an accrual method of accounting record expenses when they are incurred, rather than when they are paid. *See, e.g.*, Carl S. Warren, James M. Reeve & Jonathan Duchac, *Accounting* 104 (24th ed. 2011). Thus, a compensation expense can be accrued without it having actually been paid.[9]

That Unum relied on an unsupported assertion contrary to basic accounting principles is yet another factor relevant to assessing the degree to which Unum's structural conflict of interest may have affected its benefits decision.

## IV.   CONCLUSION

[19] We affirm the district court's ruling that the proper standard of review is abuse of discretion. We reverse, however, the district court's grant of summary judgment to Unum. We remand the case to the district court for reconsideration of the weight Unum's conflict of interest ought to be accorded in determining whether Unum abused its discretion. On

---

[9]Moreover, it is standard accounting practice to estimate the amount of yearly bonuses that will be paid and record monthly a pro-rated amount attributed to each month. *See* Steven M. Bragg, *The Ultimate Accountants' Reference* 207 (3d ed. 2010). This is so even when the payment or amount of the bonus is uncertain and dependent — such as, for example, a bonus tied to sales benchmarks — so long as the bonus can be estimated with reasonable confidence. *See id.* It is therefore difficult to draw any conclusions from TWP's monthly recording of a pro-rated share of Stephan's bonus. But this difficulty is not for the reason stated by Unum — that an expense is only truly accrued if it is paid out.

remand, the district court may, but need not, determine that additional discovery; an evidentiary hearing; and/or a bench trial is required. We leave it to the district court in the first instance to determine the procedures best suited to evaluating fully Unum's conflict of interest. Having reconsidered the nature and impact of Unum's conflict of interest — including any evidence that the conflict led Unum to render an interpretation of the policy that is unsupported by the record — the district court should re-weigh the relevant evidence and determine whether Unum abused its discretion in failing to include Stephan's bonus in its pre-disability earnings calculation.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.** Each party shall bear its own costs on appeal.

---

O'SCANNLAIN, Circuit Judge, dissenting:

I agree with the majority that we evaluate Unum Life Insurance Company's interpretation of plan terms under an abuse of discretion standard. I cannot agree, however, that remand is appropriate. The district court did not, as the majority contends, improperly weigh evidence at the summary judgment stage. And Unum's interpretation of the plan—which is silent on whether a bonus should be counted as monthly income— is reasonable and supported by the record. I would therefore affirm the grant of summary judgment in favor of Unum.

I

The majority holds that the district court "failed to apply the traditional rules of summary judgment to its analysis of whether and to what extent a conflict of interest impacted Unum's benefits determination." Op. at 11082. I disagree. The district court properly considered the evidence before it. Stephan presented no specific evidence of bias; the exhibits

he filed included correspondence with Unum, an expert report, and Unum's notes from Stephan's claim folder, all of which showed consistent handling of Stephan's claim.[1] The district court considered all of Stephan's evidence, as well as hundreds of pages of evidence submitted by Unum, before concluding that "Unum's conflict of interest did not weigh heavily upon its decision-making process in this case."

Lacking support for its assertion that the district court improperly weighed the evidence before it, the majority directs the district court on remand to "permit the admission of evidence outside the administrative record" to evaluate bias. Op. at 11098. This is not our law. A district court is not required to consider evidence outside the record. Rather, when evaluating the "nature, extent, and effect on the decision-making process of any conflict of interest," the district court "*may*, in its *discretion*, consider evidence outside the administrative record." *Abatie v. Alta Health Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006) (en banc) (emphasis added); *Nolan v. Heald College*, 551 F.3d 1148, 1150 (9th Cir. 2009) (explaining that *Abatie* "permit[s]" plaintiffs to submit evidence outside the administrative record). We therefore cannot, as the majority suggests, *require* the district court to conduct an independent assessment of bias beyond the evidence presented by the parties. *See* op. at 11098-99.

Remand thus serves only to provide Stephan a second opportunity to litigate his case. That is not appropriate here.

---

[1]While I agree with the majority that the district court erred in denying Stephan's motion to compel certain discovery, having reviewed these documents *in camera*, they would not help Stephan's case. Such an error, in light of the other evidence, does not require remand. *See Kaiser Found. Health Plan, Inc. v. Abbot Labs., Inc.*, 552 F.3d 1033, 1042 (9th Cir. 2009) (explaining that erroneous evidentiary rulings require reversal only where they are prejudicial).

## II

### A

Nevertheless, the majority decides to remand. Having so decided, the majority's opinion should be at an end. But it is not. While purporting to "express no opinion" on whether Unum's interpretation of the plan should be found unreasonable, Op. at 11106, the majority expansively opines on the correct outcome of the district court's inquiry, *see* op. at 11106-15. In doing so, the majority mischaracterizes the record and traverses well outside the bounds of our deferential review. What is more, the majority's extensive dicta, *see* op. at 11106-15—which, in any event, does not bind the district court—relies on inconclusive evidence and concludes that, because it would have interpreted that evidence differently, Unum's interpretation is unreasonable. *See* op. at 11111-14. This is not abuse of discretion review.

To take one example: the majority unfairly criticizes Unum's reliance on TWP's statement that it would "morally honor" its employment contract and posits that TWP "most probably meant" that TWP viewed the bonus as a necessary component of Stephan's salary. Op. at 11112. Based on the record, which consists only of Unum's own notes of the conversation, the meaning of TWP's statement is—as the majority itself acknowledges—inconclusive. Likewise, the majority's reliance on Stephan's offer letter is misplaced. Though the letter indicated that his bonus was "guaranteed," it also said that this bonus would be paid to Stephan "*provided* you perform at the level" TWP anticipated for a twelve-month period. Yet the majority is confident that Unum "misreads" TWP's offer letter. Op. at 11113. This dictum should have been left on the cutting room floor.

### B

The evidence demonstrates that Unum's conclusion that Stephan's bonus was not included in the calculation of

monthly benefits under the plan is a reasonable one. Unum consistently explained that it was not including the annual bonus because that bonus was contingent on Stephan completing a year of satisfactory performance, which he did not do; because the bonus was not paid on a monthly basis; because TWP had not paid premiums on the higher amount; and because it did not find TWP's expert persuasive. Its interpretation of the plan should not be disturbed. *See Conkright v. Frommert*, 130 S. Ct. 1640, 1647, 1651 (2010); *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011).

We may not substitute our views on how the plan should be interpreted for those of the plan administrator. The district court, after considering the evidence Stephan presented, correctly concluded that Unum's conflict of interest carried little weight in light of other considerations and that Unum had reasonably interpreted the plan. It should not have to revisit that determination.

### III

It is admittedly difficult to weigh the extent to which a conflict influenced a benefits determination. *See Salomaa*, 642 F.3d at 675. But "district courts are well equipped to consider the particulars of a conflict of interest." *Abatie*, 458 F.3d at 969. The district court did so correctly in this case, and I would affirm its grant of summary judgment in favor of Unum.

I respectfully dissent.